UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
NEW ALBANY DIVISION

MONROE COUNTY BOARD OF )
COMMISIONERS, *et al.*, )
) Cause No. 4:20-cv-00106-TWP-DML
Plaintiffs, )
) **PLAINTIFFS' COMBINED REPLY**
v. ) **IN SUPPORT OF PLAINTIFFS'**
) **MOTION FOR SUMMARY**
UNITED STATES FOREST SERVICE, ) **JUDGMENT AND OPPOSITON**
*et al.* ) **TO DEFENDANTS' CROSS-MOTION**
) **FOR SUMMARY JUDGMENT**
Defendants. )

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................................iii

GLOSSARY ..........................................................................................................................vii

INTRODUCTION ..................................................................................................................1

I.      DEFENDANTS CONCEDE DISPOSITIVE ISSUES ...............................................2

        A.      Defendants Concede FWS Failed to Consider the Environmental Baseline ...............3

        B.      Defendants Concede the Project May Harm Lake Monroe and Do Not Dispute
                Plaintiffs' Explanation that USFS Never Considered the Lake's Degraded Condition
                or How the Project May Exacerbate that Degradation ....................................................5

II.     USFS VIOLATED NEPA BY REFUSING TO CONSIDER ALTERNATIVES ...............7

        A.      USFS's Claim of No Unresolved Conflicts is Arbitrary and Capricious........................8

        B.      USFS Violated NEPA By Failing to Consider Mid-Range Alternatives .....................11

                1.      Plaintiffs proposed sufficiently specific alternatives ...........................................13

                2.      Plaintiffs proposed viable mid-range alternatives that would meet the
                        Project's goals by allowing actions in the Houston South area........................14

                3.      Alternatives locating logging outside the Lake Monroe
                        watershed were viable..................................................................................16

                4.      Defendants misrepresent the law and the record in claiming that USFS
                        continues to adjust the Project to reduce environmental impacts..................17

        C.      USFS Violated NEPA By Artificially Narrowing the Project's Purpose.....................19

III.    USFS Violated NEPA By Refusing to Prepare an EIS ................................................21

        A.      Defendants Misconstrue Precedent to Assert Incorrect Legal Standards....................22

                1.      Defendants misconstrue Indiana Forest Alliance v. U.S. Forest Service .......22

                2.      Defendants erroneously cite cases about supplementation of a NEPA
                        analysis ........................................................................................................24

        3.     Plaintiffs identified the correct legal standard ....................................................25

   B.   Numerous Intensity Factors Warrant the Preparation of an EIS For the Houston South Project ....................................................................................................................25

        1.     Unique characteristics of the geographic area ....................................................25

        2.     Cumulative impacts and impacts to public health and safety.........................28

        3.     Threats to endangered species, threatened violations of federal environmental law, highly uncertain impacts, and highly controversial impacts............................................................................................................................28

IV.   USFS AND FWS VIOLATED THE ESA'S REQUIREMENTS FOR FORMAL CONSULTATION REGARDING IMPACTS TO THE INDIANA BAT .......................35

   A.   USFS and FWS Failed to Use the Best Available Science ...............................35

   B.   FWS Failed to Evaluate the Current Status of the Indiana Bat ....................40

   C.   USFS and FWS Must Reinitiate Consultation.....................................................42

   D.   USFS Violated the ESA's Requirements for Formal Consultation..............45

CONCLUSION...............................................................................................................................45

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Am. Canoe Ass'n v. White,*
277 F. Supp. 2d 1244 (N.D. Ala. 2003) ......................................................................................28

*Am. Rivers v. FERC,*
895 F.3d 32 (D.C. Cir. 2018) ....................................................................................................4

*Anglers of the Au Sable v. U.S. Forest Serv.,*
565 F. Supp. 2d 812 (E.D. Mich. 2008) ..................................................................................28

*Blue Mountains Biodiversity Project v. Blackwood,*
161 F.3d 1208 (9th Cir. 1998) .................................................................................................25

*Bonte v. U.S. Bank, N.A.,*
624 F.3d 461 (7th Cir. 2010) .....................................................................................................2

*Cascadia Wildlands v. U.S. Forest Serv.,*
937 F. Supp. 2d 1271 (D. Or. 2013) ........................................................................................26

*Coalition to Protect Cowles Bog Area v. Salazar,*
2013 WL 3338491 (N.D. Ind. 2013) .......................................................................................27

*Cottonwood Envtl. Law Ctr. v. U.S. Forest Serv.,*
789 F.3d 1075 (9th Cir 2015) ...................................................................................................30

*Cronin v. U.S. Dep't of Agric.,*
919 F.2d 439 (7th Cir. 1990) ....................................................................................................27

*Ctr. for Biological Diversity v. U.S. Bureau of Land Mgmt.,*
698 F.3d 1101 (9th Cir. 2012) ..................................................................................................43

*Ctr. for Biological Diversity v. Zinke,*
900 F.3d 1053 (9th Cir. 2018) ..............................................................................36, 38, 42, 45

*Defenders of Wildlife v. U.S. Dep't of Interior,*
931 F.3d 339 (4th Cir. 2019) ...................................................................................................36

*Defs. of Wildlife v. Babbitt,*
130 F. Supp. 2d 121 (D.D.C. 2001) ...........................................................................................4

*Del. Dep't of Nat. Res. v. EPA,*
685 F.3d 1 (D.C. Cir. 2015) .....................................................................................................21

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*,
140 S.Ct. 1891 (2020) .................................................................................... 31, 34

*Gerber v. Norton*,
294 F.3d 173 (D.C. Cir. 2002) ................................................................................ 33

*Greenpeace v. Nat'l Marine Fisheries Serv.*,
80 F. Supp. 2d 1137 (W.D. Wash. 2000) ................................................................ 33

*Highway J Citizens Grp. v. Mineta*,
349 F.3d 938 (7th Cir. 2003) ......................................................................... 7, 22, 25

*Hill v. Boy*,
144 F.3d 1446 (11th Cir. 1998) ............................................................................... 25

*Hoosier Envtl. Council v. U.S. Army Corps of Eng'rs*,
105 F. Supp. 2d 953 (S.D. Ind. 2000) ..................................................................... 27

*Hoosier Environmental Council v. U.S. Department of Transportation*,
No. 1:06-cv-1442, 2007 WL 4302642 (S.D. Ind. Dec. 10, 2007) ............................ 13

*House v. U.S. Forest Serv.*,
974 F. Supp. 1022 (E.D. Ky. 1997) ......................................................................... 27

*Ind. Forest All. v. U.S. Forest Serv.*,
325 F.3d 851 (7th Cir. 2003) .......................................................... 22, 23, 25, 33, 35

*Klamath-Siskiyou Wildlands Ctr. v. Bureau of Land Mgmt.*,
387 F.3d 989, 994 (9th Cir. 2004) ........................................................................ 7, 28

*Lakes Regional Legal Def. Fund, Inc. v. Slater*,
986 F. Supp. 1169 (N.D. Iowa 1997) ...................................................................... 27

*Lawrenceburg Power, LLC v. Lawrenceburg Municipal Utilities*,
410 F. Supp. 3d 943 (S.D. Ind. 2019) (Pratt, J.) .................................................... 2, 4

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983) ................................................................................................... 30

*Nat'l Parks Conservation Ass'n v. Bureau of Land Mgmt.*,
606 F.3d 1058 (9th Cir. 2010) ................................................................................. 11

*Nat'l Parks Conservation Ass'n v. Semonite*,
916 F.3d 1075 (D.C. Cir. 2019) ......................................................................... 25, 27

*Native Ecosystems Council v. U.S. Forest Serv.*,
428 F.3d 1233 (9th Cir. 2005) ........................................................................... 12, 13

*Native Ecosystems Council v. Weldon,*
  697 F.3d 1043 (9th Cir. 2012) ...................................................................... 12

*Oceana, Inc. v. Pritzker,*
  125 F. Supp. 3d 232 (D.D.C. 2015) ............................................................... 44

*Pac. Coast Fed'n of Fishermen's Ass'ns v. U.S. Bureau of Reclamation,*
  426 F.3d 1082 (9th Cir. 2005) ...................................................................... 39

*Partners in Forestry Co-op, Northwood Alliance, Inv. v. U.S. Forest Service,*
  638 F. App'x 456, 462–63 (6th Cir. 2015) .................................................... 27

*River Road All., Inc. v. Corps of Eng'rs of U.S. Army,*
  764 F.2d 445 (7th Cir. 1985) .......................................................................... 8

*SE Alaska Conservation Council v. U.S. Forest Serv.,*
  443 F. Supp. 3d 995 (D. Alaska 2020) .......................................................... 17

*Simmons v. U.S. Army Corps of Eng'rs,*
  120 F.3d 664 (7th Cir. 1997) ................................................................. *passim*

*Stauber v. Shalala,*
  895 F. Supp. 1178 (W.D. Wis. 1995) ............................................................ 45

*Wisconsin v. Weinberger,*
  745 F.2d 412 (7th Cir. 1984) ................................................................. 24, 30

**Statutes**

Endangered Species Act, 16 U.S.C. §§ 1531–1544 .................................................. 1

  16 U.S.C. § 1536(a)(2) .................................................................................. *passim*

National Environmental Policy Act, 42 U.S.C. §§ 4321–4347 ................................ 1

  42 U.S.C. § 4332(E) ............................................................................... 1, 8, 11

**Regulations**

40 C.F.R. § 1500.1(b) ............................................................................................ 17

40 C.F.R. § 1500.2(e) ............................................................................................ 17

40 C.F.R. § 1500.3 ................................................................................................ 21

40 C.F.R. § 1508.27(b) .................................................................................... 17, 21

40 C.F.R. § 1508.27(b)(2) ..................................................................................... 23

40 C.F.R. § 1508.27(b)(3) ...................................................................... 25, 26, 27, 28

40 C.F.R. § 1508.27(b)(4) ................................................................................................ 29, 33

40 C.F.R. § 1508.27(b)(5) ................................................................................................ 29, 33

40 C.F.R. § 1508.27(b)(7) ................................................................................................ 24, 28

40 C.F.R. § 1508.27(b)(9) ........................................................................................................ 29

40 C.F.R. § 1508.27(b)(10) ...................................................................................... 29, 30, 33

50 C.F.R. § 402.02 .................................................................................................................. 3, 4

50 C.F.R. § 402.14(g)(2) ................................................................................................ 3, 4, 41

50 C.F.R. § 402.14(g)(4) ..................................................................................................... 3, 29

## **GLOSSARY**

| | |
|---|---|
| APA | Administrative Procedure Act |
| BiOp | Biological Opinion |
| EA | Environmental Assessment |
| EIS | Environmental Impact Statement |
| ESA | Endangered Species Act |
| FONSI | Finding of No Significant Impact |
| FWS | Fish & Wildlife Service |
| NEPA | National Environmental Policy Act |
| NFMA | National Forest Management Act |
| USFS | United States Forest Service |
| WNS | White Nose Syndrome |

## **INTRODUCTION**

Plaintiffs' opening brief explained that the United States Forest Service ("USFS") and the Fish & Wildlife Service ("FWS") committed serious violations of federal environmental laws in authorizing the Houston South Vegetation Management and Restoration Project ("the Project"). Specifically, Plaintiffs explained that USFS violated the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321–4347, by failing to take a hard look at the Project's environmental impacts and refusing to consider alternatives with fewer adverse impacts. Likewise, Plaintiffs demonstrated that USFS violated NEPA, and both agencies violated the Endangered Species Act ("ESA"), 16 U.S.C. §§ 1531–1544, by failing to adequately consider impacts to the endangered Indiana bat, and especially by failing to consider the greatest threat to the species, a disease known as White-Nose Syndrome ("WNS"), before authorizing additional take in connection with the Project.

Defendants' response concedes critical issues and fails to refute many important arguments. For example, Plaintiffs explained that FWS neglected its duty to consider the "environmental baseline" for the Indiana bat during formal consultation over the Project, *see* Plaintiffs' Brief ("Br.") at 40–42, but Defendants' response does not even assert that FWS satisfied this mandate. Plaintiffs also explained that USFS failed to consider how the Project will harm the already degraded waters of Lake Monroe. In response, Defendants concede that the Project will harm waterways that flow into the Lake, but fail to identify any consideration by USFS of the degradation of Lake Monroe or any analysis of how the conceded harm from the Project may exacerbate the Lake's problems.

Where Defendants do respond to Plaintiffs' arguments, they ignore or distort applicable law and misconstrue the record. For example, Defendants' response disregards NEPA's mandate that agencies must "study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources," 42 U.S.C. § 4332(E), and fails to rebut Plaintiffs' explanation that specific "unresolved

1

conflicts" over this Project required analysis of specific action alternatives. Instead, the government mischaracterizes the record to assert that Plaintiffs wished USFS to take no action at all, when in reality Plaintiffs repeatedly requested that USFS consider numerous, highly specific alternative actions. For instance, Plaintiffs explained that USFS failed to consider alternatives that would preserve the important Knobstone Trail, yet Defendants' response does not even mention the Knobstone Trail or attempt to explain why USFS refused to consider such an alternative.

Defendants likewise distort the law and the record in defending the formal ESA consultation for the Houston South Project regarding the endangered Indiana bat. Although Defendants insist the agencies were informed by the best available science, their response fails to identify any point in formal Project consultation where the agencies actually considered or applied available scientific information about the threat to this species from WNS. Instead, Defendants suggest that the agencies satisfied the ESA's mandate to use the best available science merely because their officials have general knowledge about WNS and the record includes a few relevant resources—which were not discussed, or even cited, during formal consultation over this Project. However, as Plaintiffs explained, the ESA requires agencies to do more than merely employ generally knowledgeable individuals; Congress plainly mandated that in formal consultation, "each agency shall *use* the best scientific . . . data available." 16 U.S.C. § 1536(a)(2) (emphasis added). As Plaintiffs explained—and Defendants fail to rebut—USFS and FWS failed to actually *use* available scientific information about the threat to the Indiana bat from WNS during consultation over this Project.

## I.     DEFENDANTS CONCEDE DISPOSITIVE ISSUES

"The general rule in the Seventh Circuit is that a party's failure to respond to an opposing party's argument implies concession." *Lawrenceburg Power, LLC v. Lawrenceburg Municipal Utilities*, 410 F. Supp. 3d 943, 952 n.5 (S.D. Ind. 2019) (Pratt, J.); *see also Bonte v. U.S. Bank, N.A.*, 624 F.3d 461,

466 (7th Cir. 2010) ("Failure to respond to an argument . . . results in waiver."). Here, Defendants fail to refute, and thus concede, critical issues that dictate summary judgment in Plaintiffs' favor.

## A.   Defendants Concede FWS Failed to Consider the Environmental Baseline

As described, Br. 41–42, FWS's regulations establish that its "responsibilities during formal consultation" under the ESA entail "[e]valuat[ing] the . . . environmental baseline of the listed species." 50 C.F.R. § 402.14(g)(2). The "environmental baseline" by definition "includes the past and present impacts of all Federal, State, or private actions and other human activities in the action area," *id.* § 402.02, and FWS's ESA Consultation Handbook makes clear that "[n]ew threats . . . must be considered when establishing the environmental baseline." FWS1643. Evaluating the environmental baseline is an essential step in the ESA's formal consultation process, because only by "add[ing] the effects of the action and the cumulative effects *to the environmental baseline* and in light of the status of the species" can the agency "formulate the Service's opinion as to whether the action is likely to jeopardize the continued existence of listed species." *Id.* § 402.14(g)(4) (emphasis added).

However, as Plaintiffs noted, Br. 41–42, in formal consultation over the Houston South Project, FWS did not evaluate the "past or present impacts" from all "human activities in the action area," and never even mentioned the term "environmental baseline." 50 C.F.R. § 402.02; *see also* FWS2529–74 (Project consultation documents). Likewise, FWS's consultation over the Project flouted the agency's own guidance by failing to consider the major "new threat" from WNS. Br. 41. Plaintiffs thus established that FWS's neglect of the responsibility to consider the environmental baseline constituted a clear—and critical—violation of the ESA. Br. 41–42. Plaintiffs also noted that FWS's "appended programmatic consultation" process could not cure this violation, because FWS specifically instructed USFS *not to track* any activities "where the Forest Service does not consult the Fish & Wildlife Service on Section 7 matters." FWS2730; *see also id.* ("Those types of projects are not

being tracked by the Fish & Wildlife Service."). Hence, Plaintiffs showed that FWS violated the ESA by failing to consider an adequate environmental baseline in formal consultation over this Project.

Defendants fail to respond, making no effort to identify any point in formal consultation in which FWS cataloged "all . . . human activities in the action area" and evaluated their "past and present impacts," as its own regulations require. 50 C.F.R. § 402.02; *see also id.* § 402.14(g)(2). Instead, like FWS's formal Project consultation documents, FWS2529–74, Defendants' response never even mentions the term "environmental baseline." Similarly, although Defendants assert that the agencies have "adhered to the programmatic approach" to ESA consultation, Govt. Br. 36–37, Defendants in no way respond to Plaintiffs' explanation that this appended programmatic consultation approach is not a surrogate for the environmental baseline, because FWS *specifically instructed USFS not to track all activities*, as the definition of the "environmental baseline" plainly requires. 50 C.F.R. § 402.02. Finally, Defendants do not identify any point in formal consultation where FWS addressed the threat from WNS as part of the environmental baseline, as its own guidance indicates is necessary. *See Am. Rivers v. FERC*, 895 F.3d 32, 47 (D.C. Cir. 2018) (finding that FWS "failed to incorporate the environmental baseline into its jeopardy analysis" and holding that its "jeopardy analysis is arbitrary because it fails to account for the effects of degraded conditions"); *see also id.* at 46 (FWS "acted arbitrarily" by "discarding the methodology set forth in its own handbook and its own regulatory definitions").

By failing to rebut Plaintiffs' explanation that FWS failed to consider the environmental baseline during formal consultation over the Project, the government has conceded that FWS violated the ESA in a serious manner. *Lawrenceburg Power, LLC*, 410 F. Supp. 3d at 952 n.5. This alone is a sufficient basis for the Court to enter summary judgment for Plaintiffs. *See, e.g.*, *Defs. of Wildlife v. Babbitt*, 130 F. Supp. 2d 121, 127–28 (D.D.C. 2001) (rejecting a biological opinion that

4

failed to "include an analysis of the effects of the action on the species when 'added to' the environmental baseline—in other words, an analysis of the *total* impact on the species").

    **B.**    **Defendants Concede the Project May Harm Lake Monroe and Do Not Dispute Plaintiffs' Explanation that USFS Never Considered the Lake's Degraded Condition or How the Project May Exacerbate that Degradation**

As explained, Br. 26–30, the Houston South Project may exacerbate serious environmental problems already facing Lake Monroe. The Lake provides the sole source of drinking water for over 120,000 people in and around Bloomington and attracts roughly a million visitors each year, but also faces serious environmental problems caused chiefly by sedimentation, including harmful algal blooms that can poison humans, kill wildlife, and increase the cost of treating drinking water. *Id.* Public comments repeatedly explained Lake Monroe's problems to USFS and stressed that analysis of this issue is critical because the Houston South Project is located in the Lake's watershed and may contribute sediment that will further degrade the Lake's waters. *Id.* Comments also stressed that analysis by USFS is critical *now* because the Lake's environmental problems arose *after* USFS issued its Forest Plan for the Hoosier National Forest (and thus were not analyzed when USFS issued that Plan), and because USFS is the single largest landowner in the Lake's watershed, controlling nearly 20% of the area. *Id.* Yet as Plaintiffs also explained, *id.*, USFS's NEPA analysis for this Project never acknowledged that Lake Monroe suffers from environmental degradation and never considered how the Houston South Project may, in combination with other sources of sediment in the watershed, exacerbate the Lake's already serious problems. As Plaintiffs explained, USFS's disregard for Lake Monroe's serious degradation, and its refusal to analyze how this Project will likely worsen those problems, flout NEPA's mandate to take a hard look at the Project's environmental impacts.

In response, the government fails to identify *any* place in the record where USFS considered Lake Monroe's problems or how the Project may contribute to cumulative impacts that exacerbate the degraded condition of the Lake. The government points to no recognition by USFS that Lake

Monroe has suffered harmful algal blooms each year for the last seven years, no evaluation of how the Lake's degradation is driven by sedimentation, and no analysis of how sedimentation from the Houston South Project may exacerbate this problem, especially in combination with other sources of sediment in the Lake's watershed. Yet Defendants also concede that the Project will release sediment into a watershed that contributes 30% of Lake Monroe's water. Govt. Br. 20; *see also id.* at 20–21 ("There is no scientific controversy regarding whether the Project may cause erosion or sedimentation (Forest Service agrees that it may))." By conceding that the Project will cause sedimentation in a watershed that contributes a third of Lake Monroe's water, and by failing to dispute that USFS never considered and analyzed the Lake's degraded condition—which is driven by sedimentation—Defendants effectively concede that USFS failed to take the "hard look" that NEPA requires at the Project's cumulative environmental impacts.

Defendants have no meaningful response to Plaintiffs' argument that the Forest Service arbitrarily and capriciously selected a boundary for its analysis of the Project's cumulative impacts that *only* considered impacts to the South Fork Salt Creek watershed and thus avoided *any* discussion of cumulative impacts to the waters of Lake Monroe. Br. 28–30. Defendants' sole argument—that USFS considered impacts to the South Fork Salt Creek watershed, Govt. Br. 20–21—is not responsive to Plaintiffs' explanation of why limiting the focus to South Fork Salt Creek was arbitrary and capricious, Br. 28–30. As Plaintiffs explained, USFS failed to take a hard look at cumulative impacts associated with this Project because, as Defendants concede, the Project will release sediment into a watershed that contributes a third of Lake Monroe's water—and thus may harm Lake Monroe by adding sediment that worsens the Lake's problems. Yet Defendants point to no recognition by USFS of the problem sedimentation has already caused for Lake Monroe, nor any analysis of the degree to which sedimentation from this Project may act in concert with other sources of sediment in the Lake's watershed to make that problem more severe or persistent. *See*, *e.g.*,

*Klamath-Siskiyou Wildlands Ctr. v. Bureau of Land Mgmt.,* 387 F.3d 989, 994 (9th Cir. 2004) (explaining that a cumulative impacts analysis must consider "the total amount of sediment to be added to streams within a watershed," and must assess whether "the addition of a small amount here, a small amount there, and still more at another point could add up to something with a much greater impact"). Defendants entirely fail to rebut Plaintiffs' explanation that USFS violated NEPA by arbitrarily limiting its cumulative effects analysis area to exclude any consideration of how this Project may exacerbate the degraded condition of Lake Monroe.

Ultimately, Defendants' argument is that USFS adequately considered impacts to Lake Monroe without ever mentioning the problems the Lake already faces or analyzing how the Project may, in combination with other activities, exacerbate those problems. However, turning such a blind eye to a foreseeable impact falls far short of the hard look at environmental impacts that NEPA requires. *See id.* (rejecting EA that focused solely "on its own minor watershed" with "no quantified assessment of their combined environmental impacts" on a larger watershed more broadly).

## II.    USFS VIOLATED NEPA BY REFUSING TO CONSIDER ALTERNATIVES

As explained, Br. 2–3, 17–18, the analysis of alternatives is at NEPA's core. As the Seventh Circuit stressed, "[i]f NEPA mandates anything, it mandates this: a federal agency cannot ram through a project before weighing the pros and cons of the alternatives." *Simmons v. U.S. Army Corps of Eng'rs*, 120 F.3d 664, 670 (7th Cir. 1997). Likewise, the Court of Appeals has held that "[t]he inquiry into consideration of reasonable alternatives is independent of the question of environmental impact statements [("EIS")], and operative even if the agency finds no significant environmental impact." *Highway J Citizens Grp. v. Mineta*, 349 F.3d 938, 960 (7th Cir. 2003).

The government's response—like USFS's Environmental Assessment ("EA") for this Project—disregards NEPA's plain language and downplays the vital importance of analyzing alternatives. Indeed, Defendants' background discussion of NEPA does not even mention

alternatives. Govt. Br. 10–12. More critically, Defendants' response entirely ignores the statutory mandate to "study, develop, and describe appropriate alternatives . . . in any proposal which involves unresolved conflicts," 42 U.S.C. § 4332(E), and fails to defend USFS's claim that it could dismiss alternatives because this Project ostensibly did not present unresolved conflicts. Instead, Defendants misrepresent the specific alternatives that Plaintiffs repeatedly asked USFS to consider, fail to provide any lawful basis for USFS's refusal to consider *any* action alternatives, and provide no persuasive defense of USFS's arbitrarily narrow statement of the Houston South Project's purpose.

A.     <u>USFS's Claim of No Unresolved Conflicts is Arbitrary and Capricious</u>

As explained, Br. 23–26, "unresolved conflicts concerning alternative uses of available resources" in the Houston South Project area required USFS to "study, develop, and describe appropriate alternatives" to the Project. 42 U.S.C. § 4332(E). Public comments described specific unresolved conflicts and repeatedly urged USFS to consider specific alternatives. Br. 25. However, Defendants' response, like USFS's EA, fails to acknowledge these conflicts or indicate that they were somehow resolved. For example, comments painstakingly described this unresolved conflict:

> A choice between trail closure and repurposing trails to accommodate forest management activities, or continued use of the trails for recreation, represents an unresolved conflict about alternative uses of available resources. In this case the available resources are the trails in the project area, and the alternative uses are either their conversion to a management resource or remaining a recreational resource. If recreational use is prohibited while used as a management resource, then the resource cannot accommodate both uses, thus a conflict results.

Br. 25 (quoting FS1408). Yet USFS failed to consider any alternative that would resolve this conflict—such as the specific alternative that Plaintiffs proposed of preserving the regionally unique Knobstone Trail by retaining a forested buffer around the Trail that would preserve its recreational and aesthetic character. *See* Br. 24 (citing FS580). As explained, Br. 24–26, because such alternatives could resolve conflicts by preserving important resources while also allowing USFS to viably achieve its stated goals, NEPA obligated the agency to consider such alternatives. *River Road All., Inc. v. Corps*

*of Eng'rs of U.S. Army*, 764 F.2d 445, 452 (7th Cir. 1985) ("[I]f an even less harmful alternative" than

the proposed action "is feasible, it ought to be considered.").

Defendants largely sidestep this issue, neither recognizing the particular unresolved conflicts

Plaintiffs highlighted nor even attempting to defend USFS's stated rationale in the record that

"[t]here are no unresolved conflicts" over this Project. FS1465. As explained, Br. 25, USFS

dismissed numerous public comments, which stressed the need to consider alternatives that would

resolve conflicts over the Project, by asserting that "[d]iffering opinions do not indicate unresolved

issues." FS1581 (response to comments about unresolved conflicts over trails); FS1584 (response to

comments suggesting additional alternatives); FS1465; FS1473; FS1479; FS1496; FS1511; FS1513;

FS1520. Defendants do not respond to Plaintiffs' explanation that this dismissal of unresolved

conflicts was arbitrary and capricious because the plain meaning of "conflict" includes "divergent

ideas," Br. 25 (citing FS9813 and Merriam Webster's dictionary), and thus effectively concede that

USFS's rationale for refusing to consider alternatives was arbitrary and capricious.[1]

Likewise, although Plaintiffs repeatedly stressed the need to consider an alternative that

would preserve the Knobstone Trail through a forested buffer, Br. 13, 19, 24, 32 (citing FS580,

FS642), Defendants' response never even mentions the Knobstone Trail or defends USFS's refusal

to consider any alternative that would protect it. While Defendants argue generally that USFS was

not obligated to consider alternatives that are infeasible, Govt. Br. 27–29, Defendants never explain

why USFS ostensibly could not attain its stated goals while retaining a forested buffer around this

single, regionally unique, recreationally important Trail. Similarly, the government's argument that

---

[1] USFS's response to comments also wrongly suggested that "[c]onflicts were resolved by applying
Forest Plan direction," without explaining any particular direction that purportedly resolved any
conflicts. *Eg.* FS1581. In fact, the Forest Plan does not foreclose alternatives such as preserving the
regionally unique Knobstone Trail—as Defendants concede. Govt.Br. 27 (recognizing that a Forest
Plan "does not directly compel specific actions"). To the contrary, the Forest Plan explicitly
recognizes that "long distance trails," such as the Knobstone Trail, are "in short supply," FS10271,
thus indicating that USFS should consider alternatives to preserve such scarce resources.

"Plaintiffs' proposals amount to the same as a 'no-action' alternative," Govt. Br. 29, is plainly incorrect; retaining a forested buffer around a single trail is not the same as taking no action at all.

Likewise, Plaintiffs also proposed other alternatives that would resolve conflicts over the Project and better protect important environmental resources while also allowing USFS to achieve its stated objectives by conducting most of its proposed actions. For instance, Plaintiffs proposed—but USFS never considered—an alternative that would resolve conflicts over impacts to the endangered Indiana bat by establishing a seasonal restriction on burning between April 15 and September 15—i.e., when flightless baby bats may be burned or asphyxiated by smoke. *See* Br. 24; FS9836 (noting "legitimate scientific debate" about "whether burning during the maternity roosting season of this species is acceptable"); FS9920 (proposing that USFS "[c]onduct[] prescribed burns in the winter and early spring outside the maternity roosting season" for the endangered Indiana bat).

In response, Defendants argue that *any* alternatives proposed by the public, including the proposed seasonal restriction, would be infeasible or lead to worse impacts. Govt. Br. 31. However, the record does not support the notion that a seasonal restriction on burning is infeasible. To begin with, the pages cited by Defendants simply do not state that a seasonal restriction on burning would be infeasible or harmful, and instead recognize that such a seasonal restriction would still allow USFS to conduct the "vast majority" of its prescribed burns. *See* FS9928 ("The vast majority of our prescribed burns are conducted in winter or early spring").[2] Critically, the record proves that a seasonal restriction is feasible, because *USFS itself included this restriction to protect bats in a prior, similar project*. FS9941 (imposing a "Conservation Measure[]" for a prior project under which "[p]rescribed fires will be conducted before April 15 or after September 15"); *see also* FS9940–41 (showing that the prior project included the same types of activities as the Houston South Project). Again, this specific

---

[2] The pages cited by Defendants explain USFS's view that adopting *all* of Plaintiffs' suggestions would be infeasible (which Plaintiffs dispute, as discussed below), but do not provide any justification for USFS's refusal to consider adopting *any* or *some* of Plaintiffs' suggestions.

alternative belies Defendants' argument that "Plaintiffs' proposals amount to the same as a 'no-action' alternative," Govt. Br. 29, both because it would allow the vast majority of proposed burning and because USFS itself previously authorized a similar project with this protective measure in place.

Defendants also wrongly suggest that Plaintiffs failed to raise the need for protection of the Indiana bat early enough in USFS's administrative process. Govt. Br. 22. In fact, Plaintiffs raised concerns about this species at every opportunity. *See* FS643 (scoping comments noting the presence of Indiana bats and asking "How will these species be protected?"); FS1419–20 (draft EA comments arguing that the Project may harm endangered species and stressing that "the roosts of the Indiana bat were found or detected in older mature forests that had undergone no silviculture or burning" for a long time); FS9836 (objections questioning "whether burning during the maternity roosting season of this species is acceptable," especially "given high mortality from [WNS]"). And while Plaintiffs' most specific request for a seasonal restriction occurred during objections to the Project, USFS specifically advised Plaintiff that their "letters of objection . . . *will be fully considered prior to a final decision being made on the project.*" FS9929 (emphasis added). Thus, Plaintiffs raised this alternative "with sufficient clarity to allow the decisionmaker to understand and rule on the issue raised." *Nat'l Parks Conservation Ass'n v. Bureau of Land Mgmt.*, 606 F.3d 1058, 1065 (9th Cir. 2010).

Because the Houston South Project "involves unresolved conflicts concerning alternative uses of available resources," NEPA required USFS to "study, develop, and describe appropriate alternatives," 42 U.S.C. § 4332(E). The agency failed to do so and thus violated NEPA. Defendants have no persuasive response, and summary judgment is appropriate for Plaintiffs on this issue.

**B.    USFS Violated NEPA By Failing to Consider Mid-Range Alternatives**

As Plaintiffs explained, Br. 18–19, NEPA requires agencies to consider a "full range of reasonable alternatives," including mid-range options between no action and a proposed action.

11

*Simmons*, 120 F.3d at 667. "The existence of a viable but unexamined alternative renders" a NEPA

analysis "inadequate." *Id.* at 670; *see also* Br. 18 n.5 (collecting citations).

Here, Plaintiffs repeatedly asked USFS to consider *any* action alternatives that could reduce

environmental impacts from the Houston South Project, but USFS refused to do so. For example,

Plaintiffs asked the agency to consider "[o]ne or more alternatives that contain different levels and

mixes of the management practices provided for in the proposed Houston South Project." FS640.

Likewise, Plaintiffs urged "consideration of project options with less road construction, less impacts

to existing trails, and fewer, or no, miles of no permanent roads." FS1408. Moreover, in addition to

imploring USFS to consider *any* action alternative short of the entire Project, Plaintiffs also urged

consideration of highly specific action alternatives, such as retaining a forested buffer to protect the

Knobstone Trail or imposing a seasonal restriction on certain activities to protect endangered

species (as discussed above). As explained, because viable options with less environmental impact

existed, USFS's refusal to consider *any* mid-range action alternatives violated NEPA. Br. 19.

Notably, Defendants make no effort to distinguish any cases Plaintiffs cited for the

prevailing view that NEPA mandates consideration of any viable mid-range alternative. *See* Br. 18; *id.*

18 n.5. Instead, the government distorts Plaintiffs argument by suggesting that Plaintiffs complained

only about the *number* of alternatives considered, when in fact Plaintiffs' arguments concern USFS's

refusal to consider the *substance* of mid-range alternatives. Defendants repeatedly state that "'[t]o the

extent [a plaintiff] is complaining that having only two final alternatives—no action and a preferred

alternative—violates the regulatory scheme, a plain reading of the regulations dooms that

argument.'" Govt. Br. 26, 30.[3] However, this quotation merely reflects the proposition that "the

substance of the alternatives has been a focus, not the sheer number of alternatives considered."

_____

[3] Defendants cite *Native Ecosystems Council v. Weldon*, 697 F.3d 1043 (9th Cir. 2012), but that case does
not contain this quotation and did not concern an alternatives challenge. The correct citation is to
*Native Ecosystems Council v. U.S. Forest Serv.*, 428 F.3d 1233 (9th Cir. 2005).

*Native Ecosystems Council*, 428 F.3d at 1246. Here, the issue *is* "the substance of the alternatives" that USFS refused to consider. Plaintiffs do not contend that USFS violated NEPA merely because of the *number* of alternatives considered (or rejected). Rather, USFS violated NEPA because it improperly disregarded specific mid-range alternatives that were both viable and less destructive.

   1. *Plaintiffs proposed sufficiently specific alternatives*

  Defendants' dismissal of Plaintiffs' suggested alternatives as lacking specificity is meritless. Defendants suggest that Plaintiffs merely requested that USFS consider "unspecified alternatives" in "vague and general comments," Govt. Br. 29. Defendants rely on *Hoosier Environmental Council v. U.S. Department of Transportation*, but that case is entirely distinct. There, the agency prepared a full EIS for a highway project that "considered a wide variety of proposals," including a large "group of plausible preferred alternatives," before finalizing the agency's action. No. 1:06-cv-1442, 2007 WL 4302642, *10 (S.D. Ind. Dec. 10, 2007). Because the agency had *already* considered a dozen alternatives, *id.* at *3, *10, the court found that a request to consider additional alternatives "did not point the agencies to a reasonable alternative or hybrid *they failed to consider*." *Id.* at *10 n.3 (emphasis added). Here, in stark contrast, USFS's EA considered *zero* action alternatives, despite Plaintiffs repeatedly asking it to consider *any* mid-range alternative and proposing many specific alternatives. *See, e.g.*, FS640; FS1408 (urging "consideration of project options with less road construction, less impacts to existing trails, and fewer, or no, miles of no permanent roads"). By imploring USFS to consider *any* alternatives— and proposing highly specific alternatives, such as a buffer around the Knobstone Trail or a seasonal restriction protecting bats—Plaintiffs indisputably met the "standard for meaningful participation" in USFS's decision-making process. *Hoosier Envtl. Council*, 2007 WL 4302642, at *10 n.3.

2.   *Plaintiffs proposed viable mid-range alternatives that would meet the Project's goals by allowing actions in the Houston South area*

Defendants' argument that *none* of the alternatives proposed by Plaintiffs could meet the Project's purpose, Govt. Br. 30–31, is not supported by the record. Importantly, Defendants fail to even argue that certain of Plaintiffs' alternatives would ostensibly fail to meet the Project's goals. As discussed above, Plaintiffs proposed an alternative featuring a buffer around the Knobstone Trail and another alternative featuring a seasonal restriction on burning to protect endangered species. Neither USFS's EA nor Defendants' response asserts that these alternatives would not meet the Project's purpose. Thus, because Plaintiffs proposed at least two "viable but unexamined alternative[s]," USFS's NEPA analysis was "inadequate." *Simmons*, 120 F.3d at 670.

Additionally, Defendants' assertion that Plaintiffs' other suggested alternatives would not achieve the Project's purpose cannot withstand scrutiny. Notably, Defendants' arguments about the Project's purpose are ambiguous. The Forest Plan states that "the desired condition" of Management Area 2.8 "is to maintain 4 to 12 percent of the area in young forest habitat and up to an additional 3 percent as openings." FS10301. However, Defendants rely on this "desired condition" to identify two distinct rationales for acting in the Houston South Project area. First, Defendants argue that because the Houston South area does not have 4 to 12 percent young forest, "this area no longer met the Plan's goals," and thus that the *entire* Houston South Project was necessary—and no less-damaging alternative was feasible. Govt. Br. 28. Second, Defendants argue that because the Forest Plan precludes logging in roughly 50 percent of the Forest, "it would therefore be impossible for the Forest Service to meet its management goals if it conducted no activity in any part of the Lake Monroe watershed." Govt. Br. 30. Thus, Defendants identify two ostensible reasons for focusing on the Houston South Project area and for rejecting any less harmful alternatives: (1) that the roughly 13,000 acres in the Houston South Area lacks 4 to 12 percent young forest, and thus that the entire Houston South Project is necessary to establish this percentage of the

14

Project area as young forest; and (2) that the Forest Service cannot achieve the goal of having 4 to 12 percent young forest in the entire 88,919 acres of Management Area 2.8 unless it undertakes the entire Houston South Project. Neither position has merit.

First, presuming the Project's goal is to convert 4 to 12 percent *of the Houston South Project area* into young forest,[4] Plaintiffs' alternatives could have achieved that goal. For example, Defendants describe one alternative (of many) proposed by Plaintiffs as reducing the amount of logging in the Project area "to approximately 650 acres or just 15% of the original proposal," and assert that this would "no longer meet the Project's goals." Govt. Br. 30. Simple arithmetic proves that Defendants are wrong. The Project EA states that the "Grand Total" of Forest Service land in the Project area is 10,071 acres. FS4157. Logging 650 of the 10,071 acres in the Project area would convert 6.5 percent of the Houston South area into young forest—well within the 4 to 12 percent range Defendants suggest is the Project's purpose. Additionally, the arithmetic supports Plaintiffs even more strongly considering Defendants' concession that this alternative would actually have allowed timber harvest on 1,416 acres, Govt. Br. 30, which would convert 14 percent of the area into young forest—in excess of the 4 to 12 percent that is ostensibly the Project's purpose. Accordingly, even the alternative that Defendants' response identifies as purportedly failing to meet the Project's purpose would in fact—as a matter of simple arithmetic—actually *achieve* (or exceed) the stated goal. Thus, USFS had no valid basis to reject this alternative as somehow infeasible, let alone any legitimate basis for refusing even to evaluate it during the EA's alternatives analysis for the sake of comparison.

Likewise, other alternatives proposed by Plaintiffs—but never analyzed in USFS's EA and entirely ignored in Defendants' response—would also have allowed the agency to convert even

---

[4] Plaintiffs do not believe this is the actual purpose of the Project. USFS's EA states that the "Purpose for Action" is to "move the landscape toward desired conditions" established in the Forest Plan, FS4158, which is a very broad goal that could be satisfied by numerous alternatives, as Plaintiffs explained. Br. 18–20. Nevertheless, Plaintiffs address the government's claim that this is a rationale for the Forest Service rejecting *all* alternatives proposed by the public. Govt. Br. 28

more of the Houston South area into young forest. For example, Plaintiffs requested "consideration of project options with less road construction, less impacts to existing trails, and fewer, or no, miles of no permanent roads," especially because the Project area already contains 72 miles of roads. FS1408; *see also* Br. 19 (discussing this alternative). The record shows that this alternative would reduce logging by 1,831 acres, or 46 percent—and would allow 54 percent of the overall Project, including 73 percent of proposed pine clearcuts, 58 percent of proposed selection cuts, 52 percent of hardwood thinning, and 40 percent of shelterwood cuts. FS2258. Reducing logging by 1,831 acres would allow 2,544 acres, or 25 percent of the area,[5] to be converted into young forest, vastly exceeding the 4 to 12 percent goal. Yet USFS's EA never examined this viable, less-harmful alternative (nor even explained why it refused to do so). This "viable but unexamined alternative" renders the NEPA analysis "inadequate." *Simmons*, 120 F.3d at 670.

> 3.   *Alternatives locating logging outside the Lake Monroe watershed were viable*

Defendants fare no better in contending that USFS could not achieve its stated goals for the very large Management Area 2.8 without undertaking *all* of its proposed activities in the much smaller Houston South area. The contention that it would "be impossible for the Forest Service to meet its management goals if it conducted no activity in any part of the Lake Monroe watershed," Govt. Br. 30 (citing FS265), is not supported by the record. Defendants cite a letter from USFS to Monroe County purporting to explain why USFS chose to act in the Houston South area, which simply never states that it would be impossible to achieve USFS's goals for Management Area 2.8 without logging in the Lake Monroe watershed. Moreover, contrary to Defendants' characterization, Plaintiffs did not propose that USFS undertake "no activity in any part of the Lake Monroe watershed." Govt. Br. 30. Instead, Plaintiffs proposed actions in the Lake's watershed to restore the

---

[5] The "[t]otal silvicultural treatments" in the Project amounts to 4,375 acres. FS4162. Eliminating 1,831 acres would thus leave 2,544 acres of silvicultural treatment under this alternative. The "grand total" of USFS land in the Project area is 10,071 acres. FS4157. 2,544 is 25.2 percent of 10,071.

Lake and further the Forest Plan's goal to "Maintain and Restore Watershed Health," while achieving broader goals for Management Area 2.8 through logging outside this watershed. FS640.

As explained, Br. 21, Management Area 2.8 contains 88,919 acres. FS10839. Of this area, "63,000 acres are available" outside not only Lake Monroe's watershed, but also outside *any* watershed of a municipal drinking water supply. FS9843. Thus, as comments stressed, "70 percent of Management Area 2.8 available for forest improvement does not threaten community water supplies." *Id.* The Forest Plan's "desired condition" for this area is to have a mere 4 to 12 percent as young forest. Hence, it would be possible to achieve the Plan's goals for Management Area 2.8 by logging in the 70 percent of Management Area 2.8 outside the Lake Monroe watershed. Thus, Plaintiffs' proposed alternative was feasible, and USFS had no lawful basis to refuse to consider it.[6]

> 4.   *Defendants misrepresent the law and the record in claiming that USFS continues to adjust the Project to reduce environmental impacts*

Defendants distort the law and record in suggesting that USFS did not violate NEPA in failing to consider any mid-range action alternatives because it "continues to consider environmental concerns in implementing the project, making adjustments as needed." Govt. Br. 30–31. As a matter of law, any alteration to the Project *after* the agency's decision is not a substitute for a lawful NEPA process that adequately considers alternatives *before* action is taken. *See* 40 C.F.R. § 1500.2(e) (agencies must "[u]se the NEPA process to identify and assess reasonable alternatives to proposed actions that will avoid or minimize adverse effects"); *id.* § 1500.1(b) ("NEPA procedures must ensure that environmental information is available to public officials and citizens *before* decisions are made . . . ." (emphasis added)); *SE*

---

[6] Defendants' citation of FS9928, Govt. Br. 30, is not to the contrary. In the cited email, USFS states that "[f]orest-wide, only 1% or less of MA 2.8 is currently in the young forest age classes." FS9928. This supports Plaintiffs' position that USFS has ample opportunity forest-wide to conduct timber management activities to bring MA 2.8 toward the Forest Plan's "desired conditions."

*Alaska Conservation Council v. U.S. Forest Serv.*, 443 F. Supp. 3d 995, 1014–15 (D. Alaska 2020) (finding that a USFS plan that could reduce acres logged after a decision was made "does not comply with the procedural requirements of NEPA, which are binding on the agency" because "NEPA favors coherent and comprehensive up-front environmental analysis").

Moreover, the assertion that USFS continues to alter the project to benefit the environment is factually inaccurate. Defendants cite FS2219 as "showing a 30% reduction of hardwood and pine thinning and selection after site visit revealed issues with slope," Govt. Br. 31, but the cited reference does not show any reduction in authorized logging. Instead, it reflects a 30% discount *of the projected impact on the endangered Indiana bat* from logging accidents based on an assumption that "only 70% of the thinning and selection areas are obtainable." FS2219. Contrary to Defendants' suggestion, USFS's actual decision and final EA—issued *after* the cited document—shows that USFS *increased* the authorized level of selection harvest and made only marginal reductions in pine and hardwood thinning. *Compare* FS142 (scoping notice proposing 435 acres of selection harvest, 96 acres of pine thinning, and 2,342 acres of hardwood thinning), *with* FS4162 (final EA showing USFS authorizing an *increase* in selection harvest to 462 acres, authorizing 78 acres of pine thinning for a reduction of only 18.75%, and authorizing 2,327 acres of hardwood thinning for a reduction of a mere 0.6%). Nothing in the record suggests that USFS will refrain from conducting the full authorized level of logging if it proves "obtainable," and the government's suggestion that USFS somehow cured its failure to consider alternatives by making this ostensible reduction in logging is meritless.[7]

---

[7] Defendants' citation of FS1959 to claim that USFS eliminated 43 acres of pine thinning and modified the areas to be burned is similarly misleading. While that citation shows that USFS *discussed* these measures in a May 2019 meeting, comparing USFS's initial proposal to its final decision reveals that it reduced pine thinning by only 18 acres and *increased* the amount of prescribed burning from 12,300 acres to 13,500 acres. *Compare* FS142 (scoping notice) *with* FS4162 (USFS Final Project EA).

C.      **USFS Violated NEPA By Artificially Narrowing the Project's Purpose**

As explained, USFS also engaged in an unlawful "'defining-away of alternatives'" to the Houston South Project by crafting an artificially narrow statement of the Project's purpose and need. Br. 20–23 (quoting *Simmons*, 120 F.3d at 670). Defendants do not dispute that during scoping, USFS described the Project's goal as to move Management Area 2.8 toward conditions described in the Forest Plan and invited the public to submit "substantially different ideas" from the Houston South Project. Br. 20–21. Likewise, Defendants do not dispute that, after the public asked USFS to consider alternative Project locations outside the Lake Monroe watershed—which would still allow USFS to achieve its goals for Management Area 2.8, as discussed above—the agency instead significantly narrowed the Project's purpose by claiming that action was necessary in the Houston South area. Br. 22. Finally, Defendants do not dispute that USFS then used its unduly narrowed statement of Project purpose to reject public calls for consideration of alternative Project locations. *Id.* As the Seventh Circuit stressed in similar circumstances, "contriv[ing] a purpose so slender as to define competing 'reasonable alternatives' out of consideration (and even out of existence)" constitutes an "obvious way for an agency to slip past the strictures of NEPA." *Simmons*, 120 F.3d at 666. Despite Plaintiffs' explanation that *Simmons* governs this issue, Br. 23, Defendants never cite that case or explain how this Court could disregard the Seventh Circuit's binding, on-point authority.

Instead, Defendants attempt to divert the Court's focus from this issue by faulting Plaintiffs for not arguing that the Project "is inconsistent with or unsupported by the Forest Plan" or is "unnecessary." Govt. Br. 28. This response misses the point of Plaintiffs' NEPA argument. The Forest Plan, as Defendants concede, "does not directly compel specific actions," such as this particular Project. Govt. Br. 27. Plaintiffs have no quarrel in this case with USFS's general goal of moving Management Area 2.8 toward the "desired conditions" in the Forest Plan. Instead, as discussed above, Plaintiffs contend that because Management Area 2.8 is more than eight times the

size of the Houston South Project area and includes tens of thousands of acres outside the Lake Monroe watershed, USFS had many viable alternative ways to achieve this general goal without risking further harm to Lake Monroe. Thus, Plaintiffs contend that the agency acted unlawfully by defining this Project's purpose so narrowly that such reasonable alternatives were arbitrarily forced out of consideration. Defendants do not meaningfully respond to Plaintiffs' actual argument.

Rather, Defendants distort the record by claiming that, in proposing alternative Project locations, "Plaintiffs asked Forest Service to change its goal to 'Maintain and Restore Watershed Health.'" Govt. Br. 28 (citing FS636, FS640). In fact, "Maintain and Restore Watershed Health" *is one of USFS's own stated "GOALS"* that the Forest Plan describes as representing "the overall purpose of the Forest." FS10269–70. As the Forest Plan explains, "[t]his goal emphasizes collaborative stewardship of watersheds" and states that USFS will "contribute to the restoration of water quality." FS10270. Likewise, the Forest Plan states that the agency will "[g]ive priority to stabilizing areas discharging soil into watercourses, *especially those that affect the watershed of municipal or recreational reservoirs"* such as Lake Monroe. FS10286 (emphasis added). The comments Defendants cite did not ask USFS to change the Project's goal, but rather stressed that USFS's own "Goals and Objectives include 'Maintain and Restore Watershed Health'" and that this Project "should be analyzed *in the context of this goal.*" FS636 (emphasis added). Thus, Plaintiffs asked USFS to consider alternatives to advance *its own* Forest Plan Goal to "Maintain and Restore Watershed Health" by taking actions *within* the Lake Monroe watershed that could restore the Lake, such as restoring eroding land or decommissioning roads, and to advance USFS's forestry goals for Management Area 2.8 by siting "[v]egetation management in Management Area 2.8 outside the Lake Monroe Watershed." FS640.

Hence, the government's attempt to claim that Plaintiffs asked USFS to change its goal for the Project altogether is incorrect; to the contrary, Plaintiffs asked the agency to further—*or at least consider*—its own goals in its own Forest Plan. However, USFS entirely failed to do so. Not only did

the agency refuse to consider the alternatives the public proposed, but the agency's EA for the Project does not even *mention* the Forest Plan's goal to "Maintain and Restore Watershed Health." *See* FS4150–4234. As explained, Br. 25, USFS's disregard for the public's comments was arbitrary and capricious. *Del. Dep't of Nat. Res. v. EPA*, 685 F.3d 1, 14–15 (D.C. Cir. 2015) ("[R]efus[ing] to engage with the commenters'" suggestions is "arbitrary and capricious on that ground alone").

Ultimately, the government's argument boils down to this: there was no alternative other than the *entire* Houston South Project, *exactly* as USFS proposed it, that could possibly have achieved the agency's purpose for this Project. However, binding authority squarely forecloses this "obvious way for an agency to slip past the strictures of NEPA." *Simmons*, 120 F.3d at 670. An agency may not "contrive a purpose so slender as to define competing 'reasonable alternatives' out of consideration (and even out of existence)." *Id.* Accordingly, in so contriving the purpose for the Houston South Project, USFS violated NEPA, and summary judgment is appropriate for Plaintiffs.

## III.   USFS Violated NEPA By Refusing to Prepare an EIS

As explained, Br. 30–35, the Houston South Project required a more complete analysis in an EIS because numerous factors in NEPA's implementing regulations, which are "binding on all Federal agencies," 40 C.F.R. § 1500.3, reveal that the Project may have "significant" environmental impacts. NEPA's implementing regulations require agencies to determine whether an action may impact the environment "[s]ignificantly," such that an EIS is required, by evaluating ten specific "intensity" factors. *Id.* § 1508.27(b). As Plaintiffs explained—and Defendants do not dispute—any single intensity factor may necessitate an EIS. Br. 30 (citing cases from the Ninth Circuit, Tenth Circuit, and D.C. Circuit). Here, seven intensity factors reveal that an EIS is necessary for the Houston South Project. Br. 31–35 (discussing 40 C.F.R. § 1508.27(b)(2), (3), (4), (5), (7), (9), (10)).

In response, Defendants provide erroneous statements of the legal standard for when an agency must prepare an EIS and fail to persuasively rebut Plaintiffs' explanation that numerous intensity factors require preparation of an EIS in this instance.

### A.   Defendants Misconstrue Precedent to Assert Incorrect Legal Standards

1.   *Defendants misconstrue* Indiana Forest Alliance v. U.S. Forest Service

Defendants significantly misconstrue Seventh Circuit precedent by claiming that "[i]n deciding whether an agency must go back and draft an EIS, the Court must take a two-step approach" under which the plaintiff must first show a substantial scientific controversy and the agency "must then show that it has considered the dispute and addressed it in its final decision." Govt. Br. 16 (citing *Ind. Forest All. v. U.S. Forest Serv.*, 325 F.3d 851 (7th Cir. 2003)). Although *Indiana Forest Alliance* did establish the "two-step approach" Defendants identify, *id.* at 858, "*only one of the ten factors that the CEQ regulations identify as indicia of intensity*" was at issue in that case—namely "'[t]he degree to which the effects on the quality of the human environment are likely to be highly controversial,'" *id.* at 856–57 (quoting 40 C.F.R. § 1808.27(b)(4)). The Seventh Circuit synthesized its "two-step approach" from Ninth Circuit cases that construed this single "highly controversial" intensity factor, *id.* at 857–58, and applied its two-step approach solely to determine whether the project at issue was "highly controversial," *id.* at 858–61. Because *Indiana Forest Alliance* crafted and applied a "two-step approach" *only* for determining whether an action is so "highly controversial" that it requires an EIS, that case does not support Defendants' claim that the "two-step approach" governs any argument that an EIS is necessary. (Plaintiffs addressed this "two-step approach" where it is relevant to the argument that this Project is "highly controversial." Br. 34–35.).[8]

---

[8] *See also Highway J Citizens Group*, 349 F.3d at 957 (using this two-step approach to determine whether a project "was highly controversial, *as we recently defined that term* in *Indiana Forest Alliance*," but considering other intensity factors, such as effects on public health and highly uncertain impacts, without relying on the two-step analysis (emphasis added)).

Defendants' misunderstanding of *Indiana Forest Alliance* taints many of their arguments. For example, Defendants broadly argue that no EIS is necessary because the Houston South Project involves roughly 4,000 acres of logging and 13,000 acres of burning, while *Indiana Forest Alliance* found that no EIS was required for a USFS plan to log 3,111 acres. Govt. Br. 18. However, Defendants merely highlight a superficial similarity between the cases while misunderstanding the Seventh Circuit's reasoning (and Plaintiffs' arguments). For example, Defendants claim that *Indiana Forest Alliance* found that scientific objections failed to create a "substantial dispute," *id.*, but in fact the Seventh Circuit found that the plaintiffs *did establish* a substantial scientific dispute (i.e., satisfied the first step), *Ind. Forest All.*, 325 F.3d at 859–60. The Seventh Circuit instead held that the agency adequately addressed this dispute because the record was "replete with scientific data addressing the [plaintiffs'] concerns" (i.e., the plaintiffs failed at the second step). *Id.* at 860. Thus, contrary to the facile argument that *Indiana Forest Alliance* broadly indicates that no EIS is necessary here, that case actually establishes that—when considering whether this Project is "highly controversial"—the Court must carefully review the record to determine first "whether the plaintiffs have demonstrated a substantial dispute as to the effects of the . . . project," and second, "whether the Forest Service's decision to proceed despite this scientific disagreement is arbitrary and capricious." *Id.* at 859.[9]

Additionally, Defendants inappropriately invoke the "two-step approach" from *Indiana Forest Alliance* where it simply does not apply. For instance, in response to Plaintiffs' argument that an EIS is necessary under *a different intensity factor*, 40 C.F.R. § 1508.27(b)(2), because the Project area contains unique resources such as a key portion of the Knobstone Trail, the government argues that no EIS is necessary because "[t]here are no significant scientific disputes about impacts to trails."

---

[9] The facts of *Indiana Forest Alliance* do not govern either step of this analysis, because the scientific controversy in that case was entirely distinct, involving different impacts to different species. *See* 325 F.3d at 860 (discussing disputes about impacts to the scarlet tanager, a species of bird).

Govt. Br. 18–19. Likewise, in response to Plaintiffs' argument under *another intensity factor* that an EIS is necessary because the Project may cause sedimentation and thus "is related to other actions with . . . cumulatively significant impacts" on Lake Monroe, 40 C.F.R. § 1508.27(b)(7), Defendants argue no EIS is necessary because "[t]here is no scientific controversy regarding whether the Project may cause erosion or sedimentation." Govt. Br. 20–21. Defendants' arguments that rely on an inapposite legal standard are without merit. Controlling authority does not support Defendants' mistaken view.

### 2.  *Defendants erroneously cite cases about supplementation of a NEPA analysis*

Defendants also inappropriately rely on a legal standard that determines when an agency must prepare a *supplemental* EIS—as opposed to an adequate analysis in the first instance—to argue that USFS has no duty under that separate standard to prepare a supplemental EA or EIS. Govt. Br. 21, 23, 25. Supplementation of a lawful, thorough EIS may be necessary if "new information provides a *seriously* different picture of the environmental landscape such that *another hard look is necessary*," which requires Plaintiffs to show that "new information presents a seriously different picture of the likely environmental consequences of the proposed action not adequately envisioned by the original EIS." *Wisconsin v. Weinberger*, 745 F.2d 412, 418–20 (7th Cir. 1984) (second emphasis added). However, as the Seventh Circuit explained (in a case Defendants cite), there is "[a]n important difference between an agency's decision whether to file an initial EIS," which is the issue in this case, "and its decision whether to supplement an EIS," because "the decision to supplement is made in light of an already existing, in-depth review of the likely environmental consequences." *Id.* at 418. This "important difference" reveals that Defendants seriously misconstrue the law when arguing that "Plaintiffs do not present any new, significant impacts that result in a different environmental outcome, and there is no basis to order Forest Service to conduct additional analysis." Govt. Br. 25. That is not Plaintiffs' burden because Plaintiffs have not raised a claim that a supplemental EIS is necessary —i.e., in order to supplement a detailed EIS previously completed by

24

the agency for this Project. Instead, Plaintiffs argue that USFS has failed *in the first instance* to take a hard look at the Project's environmental impacts Supp. Compl., ECF No. 24-1, ¶¶ 204–211.

3.     *Plaintiffs identified the correct legal standard*

As explained, Br. 30–31, in resolving Plaintiffs' EIS claim, the Court must "insure that the agency has taken a 'hard look' at environmental consequences." *Highway J Citizens Grp.*, 349 F.3d at 953. Because USFS refused to prepare an EIS based on its Finding of No Significant Impact ("FONSI"), the Court must examine the record to determine whether that FONSI is arbitrary and capricious. *Id.* at 952–53. "An agency's decision not to prepare an EIS will be considered unreasonable if the agency fails to supply a convincing statement of reasons why potential effects are insignificant." *Blue Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1211 (9th Cir. 1998).[10] "Thus, to prevail on a claim that the Forest Service violated its statutory duty to prepare an EIS, a plaintiff need not show that significant effects will in fact occur," and "[i]t is enough for the plaintiff to raise substantial questions whether a project may have a significant effect on the environment." *Id.* at 1212; *see also Ind. Forest All.*, 325 F.3d at 857 (relying on *Blue Mountains Biodiversity Project.*).

**B.     Numerous Intensity Factors Warrant the Preparation of an EIS For the Houston South Project**

1.     *Unique characteristics of the geographic area*

An EIS is necessary where an action may impact "[u]nique characteristics of the geographic area, such as proximity to historic or cultural resources, park lands, prime farmlands, wetlands, wild and scenic rivers, or ecologically critical areas." 40 C.F.R. § 1508.27(b)(3). As explained, Br. 31-32, the record proves beyond any legitimate dispute that the Houston South Project area features

---

[10] *Accord Nat'l Parks Conservation Ass'n v. Semonite*, 916 F.3d 1075, 1082 (D.C. Cir. 2019) (An agency must "make a convincing case for its finding of no significant impact"); *Hill v. Boy*, 144 F.3d 1446, 1450–51 (11th Cir. 1998) (holding agency "did not make a convincing case for its finding of no significant impact").

"[u]nique characteristics." For example, the area abuts the Charles C. Deam Wilderness, which is the *only* congressionally designated wilderness area in Indiana, and which the Project may adversely impact. Defendants' response dismisses the Wilderness in a single footnote because "it is not within the Project's boundaries." Govt. Br. 19 n.10. Defendants miss the point; this intensity factor establishes that a Project's impacts may be significant based on "*proximity to*" unique areas such as the Deam Wilderness. 40 C.F.R. § 1508.27(b)(3) (emphasis added). The Project area *abuts*, and thus is certainly in proximity to, the Wilderness. Defendants do not dispute, and thus concede, that the Project may harm the Wilderness. *See* Br. 31 (discussing harms to the Wilderness including from smoke and from an additional recreational burden that may undermine wilderness character). *See Cascadia Wildlands v. U.S. Forest Serv.*, 937 F. Supp. 2d 1271, 1281 (D. Or. 2013) (requiring EIS where logging "may have significant consequences to [a potential wilderness area's] unique attributes").

Likewise, Plaintiffs explained that the Project area encompasses, and will close portions of, the Knobstone Trail, a regionally unique, long-distance hiking trail. Br. 31; *see also* FS10271 (Forest Plan recognizing that "long distance trails" are "in short supply"). Again, Defendants do not dispute that this trail is regionally unique nor that the Project will harm this unique resource or the qualities and characteristics of the Trail that users most value; in fact, Defendants' response does not even *mention* the Knobstone Trail. Instead, Defendants argue that the Project's impacts to trails were "squarely considered and addressed in the EA," Govt. Br. 19. However, Defendants do not identify any point where the EA considered impacts to the unique Knobstone Trail—because no such point exists. Despite comments repeatedly stressing the need to consider impacts to the Knobstone Trail, *e.g.* FS579, FS9857,[11] the EA never recognizes the unique regional value of the Knobstone Trail or analyzes how the Project may undermine that value. *See* FS4150–4234 (never discussing this Trail).

---

[11] USFS also received comments from the Knobstone Trail Hiking Association emphasizing these issues and also asking USFS to consider retaining a forested buffer around the Trail. FS625, FS1378.

Defendants' suggestion that USFS adequately considered impacts to the Trail without considering its regionally unique value, or assessing how the Project may harm the Trail or its users, is meritless.

Finally, Plaintiffs explained that Lake Monroe is also a unique environmental resource that the Project may adversely affect. As described above, Defendants concede that the Project may harm the Lake through sedimentation, yet the EA never recognizes the Lake's serious existing problems or analyzes how the Project may exacerbate those problems, which are especially acute since the Lake serves as a critical drinking water supply for over 120,000 people. *See supra* at 5.

Notably, Defendants' response does not address the specific unique resources Plaintiffs identified; Defendants do not even mention the Knobstone Trail and dismiss the Deam Wilderness in a footnote. Defendants miss the point by claiming the area "has no parklands, prime farmlands, wild and scenic rivers or ecologically critical areas," Govt. Br. 16, because this intensity factor lists these as *mere examples* of unique geographic characteristics. *See* 40 C.F.R. § 1508.27(b)(3) (describing "[u]nique characteristics . . . , *such as*" these features (emphasis added)). Likewise, Defendants' claim that Plaintiffs are "conflating" the Project area with the entire Hoosier National Forest, Govt. Br. 17, is meritless because Defendants ignore the specific nearby resources that Plaintiffs identified.[12]

Because the Project area contains, or is in proximity to, unique resources, and may harm those resources—as Defendants fail to dispute—this factor demonstrates that an ES is necessary because the Project may have significant environmental impacts. *See Semonite*, 916 F.3d at 1086–88 (requiring EIS partly due to nearby unique historic areas); *House v. U.S. Forest Serv.*, 974 F. Supp.

---

[12] The cases Defendants cite, Govt. Br. 17, are distinct. Most do not discuss this intensity factor, or any intensity factor. *See Cronin v. U.S. Dep't of Agric.*, 919 F.2d 439 (7th Cir. 1990); *see also Hoosier Envtl. Council v. U.S. Army Corps of Eng'rs*, 105 F. Supp. 2d 953 (S.D. Ind. 2000); *Coalition to Protect Cowles Bog Area v. Salazar*, 2013 WL 3338491 (N.D. Ind. 2013); *Lakes Regional Legal Def. Fund, Inc. v. Slater*, 986 F. Supp. 1169 (N.D. Iowa 1997). The only case that *does* discuss this factor is *Partners in Forestry Co-op, Northwood Alliance, Inv. v. U.S. Forest Service*, but in that case the agency specifically explained why local features were either not unique or would not be affected, 638 F. App'x 456, 462–63 (6th Cir. 2015), whereas the EA here neither discussed the Knobstone Trail nor evaluated impacts to the Deam Wilderness nor recognized the problems facing Lake Monroe.

1022 (E.D. Ky. 1997) (requiring EIS partly because project was "located near . . . a significant geologic site"); *Anglers of the Au Sable v. U.S. Forest Serv.*, 565 F. Supp. 2d 812, 825–27 (E.D. Mich. 2008) (rejecting failure to prepare an EIS to analyze "unique recreational aspects" of national forest).

### 2. *Cumulative impacts and impacts to public health and safety*

As explained, Br. 32–33, two additional intensity factors demonstrate that the Project may have significant impacts because it is "related to other actions with individually insignificant but cumulatively significant impacts" on Lake Monroe, 40 C.F.R. § 1508.27(b)(7), and because the resulting impact on Lake Monroe "affects public health or safety," *id.* § 1508.27(b)(3). As described above, Defendants concede that the Project may release sediment into waterways that contribute 30% of Lake Monroe's water, which already suffers poisonous algal blooms caused by sedimentation. *See supra* at 5. And although Defendants argue that USFS adequately considered impacts to the Lake, in fact the EA never acknowledges the Lake's poor water quality or analyzes how the Project may exacerbate it. *Id.* Accordingly, Defendants fail to rebut Plaintiffs' explanation that the Project may have cumulatively significant impacts on Lake Monroe. *See Klamath-Siskiyou*, 387 F.3d at 994–97 (rejecting EAs that analyzed only impacts to a small "minor watershed" without considering cumulative impacts to an already degraded waterway). And because the Lake's problems, which this Project may worsen, include algal blooms that could poison the Lake's roughly one million annual visitors, the Project may affect public health and safety. *Cf. Am. Canoe Ass'n v. White*, 277 F. Supp. 2d 1244 (N.D. Ala. 2003) (EA failed to take a hard look at whether a "Reservoir might become unfit for human consumption" due to algal blooms from sediment and nutrient runoff).

### 3. *Threats to endangered species, threatened violations of federal environmental law, highly uncertain impacts, and highly controversial impacts*

As explained, Br. 33–35, four additional intensity factors reveal that the Houston South Project may have a significant environmental impact on the endangered Indiana bat. First, because

the Project will "adversely affect" the Indiana bat—as Defendants concede, Govt. Br. 36—it indisputably "may adversely affect an endangered . . . species." 40 C.F.R. § 1508.27(b)(9). Second, because USFS and FWS failed to consider and analyze available scientific resources regarding WNS, which is the greatest threat to this species, and failed to consider this Project's additive impacts on the species in light of its dire status from that disease, the Project's impacts remain "highly uncertain." *Id.* § 1508.27(b)(5). Third, because the agencies' failure to consider available science on this important issue flouted the ESA's mandate to "use the best scientific . . . information available," 16 U.S.C. § 1536(a)(2), the Project "threatens a violation of Federal . . . law or requirements imposed for the protection of the environment." 40 C.F.R. § 1508.27(b)(10). Finally, because USFS and FWS failed to consider scientific information that could resolve a substantial scientific dispute over the Project's effects on the endangered Indiana bat in combination with the disease WNS, the Project's impacts are also "likely to be highly controversial," another intensity factor. *Id.* § 1508.27(b)(4).

In response, Defendants generally assert that they adequately analyzed how the Project will impact the endangered Indiana bat. Govt. Br. 21–25. However, Defendants are wrong on the law and the facts. For example, Defendants suggest an inappropriate legal standard by arguing that Plaintiffs have somehow failed to show that the Project "threatens a violation" of the ESA by not proving "that the Houston South [Project] would jeopardize the entire species." *Id.* at 21. This is not Plaintiffs' burden. The ESA places the burden in formal consultation squarely on "[e]ach Federal agency" to "insure that any action . . . is not likely to jeopardize" a listed species, and explicitly mandates that in doing so "each agency shall use the best scientific . . . data available." 16 U.S.C. § 1536(a)(2). FWS's regulations specify that the agency's "responsibilities" include using "the best scientific . . . data available" in order to "[a]dd the effects of the action and cumulative effects to the environmental baseline and in light of the status of the species . . . formulate the Service's opinion as to whether the action is likely to jeopardize" an endangered species. 50 C.F.R. § 402.14(g)(4).

Without satisfying these requirements, the agencies cannot meet their duty to "insure" against jeopardy. Accordingly, Plaintiffs' burden in showing that the Project "threatens a violation" of the ESA, 40 C.F.R. § 1508.27(b)(10), is not to prove that the Project will necessarily cause jeopardy to an entire species; instead, Plaintiffs need only show that the agencies have neglected their analytical duties in formal consultation. *See Cottonwood Envtl. Law Ctr. v. U.S. Forest Serv.*, 789 F.3d 1075, 1089 (9th Cir 2015) ("It is not the responsibility of the plaintiffs to prove, nor the function of the courts to judge, the effect of a proposed action on an endangered species when proper procedures have not been followed."); *see also Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (Agency action is "arbitrary and capricious if the agency has . . . entirely failed to consider an important aspect of the problem"). Plaintiffs easily satisfy this burden.[13]

As to the facts, Defendants misleadingly downplay the plight of the Indiana bat. For example, while stressing that the total population of the Indiana bat range-wide is roughly 500,000 and that many bats reside outside Indiana, Govt. Br. 21, Defendants ignore the fact that Indiana hosts more than a third of *all* Indiana bats, more than any state except Missouri, and that Indiana has lost more Indiana bats *than any other state* since WNS emerged. FWS1199–1200.[14]

Likewise, Defendants incorrectly suggest USFS and FWS could disregard impacts to the Indiana bat from WNS because those impacts "primarily" occur in hibernacula and because the Project area does not contain any known hibernacula. Govt. Br. 22–23. In fact, WNS poses grave threats to Indiana bats at all life stages, not merely during hibernation as Defendants wrongly

---

[13] Likewise, Defendants rely on the wrong standard by arguing that WNS is "not a 'new' impact that has never been considered." Govt. Br. 22–25. As explained above, this argument relies on an entirely inapposite legal standard for a different type of NEPA claim that an agency must supplement an existing, adequate EIS—which the Seventh Circuit has explained has an "important difference" from the claims actually at issue in this case. *Wisconsin*, 745 F.2d at 418.

[14] As recently as 2011, Indiana was home to more of this species than any other state, but Missouri now hosts slightly more of this species because Indiana has lost so many. *See* FWS1199–1200.

suggest. As explained, Br. 9, 44, FWS has described how sick bats face "additional energetic demands," including from "fat depletion" and "wing damage . . . that makes flight (migration and foraging) more difficult." FRW1475. Likewise, females that survive hibernation, which face an "exacting" energy budget even when *not* sick, FWS9961, face an even more precarious situation during the active season when suffering from WNS because they must "partition energy resources between foraging, keeping warm, reproducing, and recovering from the disease." FWS1475. Because these impacts from WNS make it more difficult for Indiana bats to survive and reproduce *during their active season*, Defendants' suggestion that USFS and FWS could ignore these impacts because the Project area contains no known hibernacula is entirely without merit.[15]

Defendants also misleadingly downplay this Project's anticipated impacts to the Indiana bat (even absent any consideration of WNS) by claiming that it is expected to harm "a low number of adult male bats." Govt. Br. 22. Contrary to Defendants' suggestion that female bats do not use the Project area, Govt. Br. 21–22, studies "have documented use of the [Hoosier] by male *and female* Indiana bats," FWS2534 (emphasis added), and FWS has found "it is reasonable to assume that additional maternity colonies of Indiana bats are present on the [Hoosier] and may be utilizing roosting and foraging habitat *throughout the Forest*." FWS2673 (emphasis added). And while Defendants stress that studies have not definitively identified a maternity colony in the Project area, Govt. Br. 21–22, FWS has explained that maternity colonies are "difficult to locate," FWS2670, and

---

[15] Defendants are especially wrong in arguing that the agencies could lawfully address WNS only for the Northern long-eared bat, and not the Indiana bat, because a hibernaculum for the Northern long-eared bat is within 5 miles of the Project area. Govt. Br. 24. To begin with, this rationale appears nowhere in the record, and is thus an impermissible "*post hoc* rationalization." *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S.Ct. 1891, 1909 (2020). It is also wrong. Readily available scientific information, which the ESA required the agencies to consider, 16 U.S.C. § 1536(a)(2), shows that *both species* suffer from WNS, and that the disease harms the Indiana bat while hibernating and while active. The ESA thus obligated the agencies to consider WNS's impacts to the Indiana bat *as well as* to the Northern long-eared bat. That the agencies did so for the Northern long-eared bat conspicuously highlights their failure to do so for the Indiana bat, especially because the Indiana bat is listed as endangered while the Northern long-eared bat is listed only as threatened.

that "monitoring has not been carried out to the extent that the take of a maternity colony would likely be captured if it did occur." FWS2689. Moreover, the Project may harm Indiana bats chiefly through prescribed fire during the bats' active period (and to a lesser extent timber accidents), FWS2563, and fires are more likely to harm baby bats and females than adult males. *See* FWS2683 (noting that adult males would flee a burn, but that "if a maternity colony was located within a burn area, the females and non-volant young . . . would be susceptible to smoke and flames").

Defendants also wrongly downplay how often Indiana bats have been detected in or near the Project area, or in similar areas of the Forest, suggesting that no members of this species have been detected in the area since 2010, including in studies conducted by Plaintiffs. Govt. Br. 21–22. In fact, Plaintiffs explained that their studies identified Indiana bats near the Houston South area in 2019, Stant Decl., ECF No. 34-1 ¶ 9, and that an ongoing survey of the Project area documented the presence of the Indiana bat in the Project area in June 2020 during the species' maternity roosting season, *id.* ¶ 11; *see also* FS1419–20 (Plaintiff comments explaining detection of Indiana bats in similar forests to the Project area in recent years).[16]

In addition to downplaying the plight of this species, Defendants also misleadingly play up the degree to which USFS ostensibly considered the species. For instance, Defendants claim that USFS reviewed various scientific sources "during their analysis," Govt. Br. 24 (citing FS 10046, 10013), but neither USFS's EA nor USFS's Biological Evaluation submitted to FWS during formal consultation (nor FWS's concurrence) ever discuss—or even cite—these resources. *See* FS4223–30 (references for USFS EA not listing these sources); FWS2568 (USFS Biological Evaluation "Literature Cited" section). The mere fact that the record *contains* some literature on the Indiana bat

---

[16] Defendants also fail to rebut Plaintiffs' explanation that USFS and FWS ignored a warning from the Indiana Department of Natural Resources stressing the need to consider WNS. Br. 34. Defendants claim this warning came from a letter from Plaintiffs regarding different species, but in fact Plaintiffs' letter "implor[ed] the USFS to heed" a statement from the state of Indiana *specifically* noting that WNS "is hurting the Indiana bat population." FS9831.

is not a substitute for the agencies' *actual consideration and application* of these resources. *See* 16 U.S.C. § 1536(a)(2) (requiring agencies to "use" the best available science, as opposed to merely possess it); *Greenpeace v. Nat'l Marine Fisheries Serv.*, 80 F. Supp. 2d 1137, 1149-50 (W.D. Wash. 2000) (finding a violation of the ESA where "necessary data was available but simply not analyzed").

Defendants' citation of FWS889–939, Govt. Br.25, is especially misleading because this is merely a list of relevant scientific references, which there is no evidence that USFS or FWS ever considered. Indeed, the record does not contain many of these scientific resources, or any discussion by USFS or FWS of their contents or findings. As such, this list merely confirms that there is available scientific information (and a great deal of it) that the agencies failed to actually *use*. *See, e.g.*, *Gerber v. Norton*, 294 F.3d 173, 185 (D.C. Cir. 2002) ("[S]tating that a factor was considered—or found—is not a substitute for considering or finding it." (quotation marks and citation omitted)).

Ultimately, Defendants inaccurately downplay the plight of the Indiana bat and misleadingly play up the agencies' consideration of this species because (as discussed in greater detail below), they have no persuasive response to Plaintiffs' explanation that the agencies failed to consider the best available scientific information about the single greatest threat to this highly imperiled endangered species, and in particular failed to evaluate how the Houston South Project may contribute further harm to the Indiana bat in addition to the baseline harm from WNS. As Plaintiffs explained, the failure to consider this information violated the ESA, and thus more than "threatens a violation" of a federal environmental law, which is all NEPA requires for an EIS to be prepared. 40 C.F.R. § 1508.27(b)(10). Likewise, the failure to consider this scientific information means that the Project's impacts to the Indiana bat remain "highly uncertain," and an EIS is warranted on this basis as well. *Id.* § 1508.27(b)(5). These are sufficient grounds for the Court to find an EIS is necessary here.

Additionally, the Project also warrants an EIS because it is "highly controversial." *Id.* § 1508.27(b)(4). As explained, Br. 34, Plaintiffs satisfied the first step of the Seventh Circuit's "two

step approach" to identifying "highly controversial" actions, *Ind. Forest All.*, 325 F.3d at 858, by identifying a "legitimate scientific debate" about impacts to the Indiana bat particularly because of the new threat from WNS. FS9836, FS9828, FS9831. Defendants' sole response on the first step of this analysis is to suggest that Plaintiffs raised this concern too late in the administrative process for this Project, Govt. Br. 22, but as discussed *supra* at 11, Plaintiffs raised this issue at every available opportunity and USFS specifically assured Plaintiffs that these concerns would be "fully considered prior to a final decision being made on the project." FS9929. Accordingly, Plaintiffs have carried their burden under the first step of the Seventh Circuits' *Indiana Forest Alliance* analysis by establishing a substantial scientific controversy over the Project's impacts on the Indiana bat.

And as Plaintiffs also explained, Br. 35, at the second step of the "highly controversial" analysis, FWS failed to "consider the dispute and address the concerns in its final decision," *Ind. Forest All.*, 325 F.3d at 858, because USFS did not even acknowledge that the Indiana bat suffers from WNS, much less analyze how the Project may harm the species *in combination with* this deadly disease. Defendants effectively concede this point, claiming that although USFS and FWS "were well aware of WNS," the EA for this Project "does not specifically mention WNS in its section on the Indiana bat" because the agencies *specifically decided not to do so*, based on the absence of an Indiana bat hibernaculum in the Project area. Govt. Br. 33–34. However, not only is this an impermissible "*post hoc* rationalization" that was never stated by the agencies in the record, *Dep't of Homeland Sec.*, 140 S.Ct. at 1909, but this purported justification lacks merit because, as discussed above, WNS harms the Indiana bat throughout its active season in addition to during hibernation. Hence, Defendants' argument is merely a glaring admission that the EA fails to resolve the substantial scientific dispute about the Project's impacts on the Indiana bat in concert with WNS because the agencies *specifically declined to address or resolve this controversy*. Thus, this case is a far cry from *Indiana Forest Alliance*, where the record was "replete with scientific data addressing the Plaintiffs' concerns,"

34

325 F.3d at 860. Because the agencies concededly never addressed or resolved the controversy

Plaintiffs identified, the Project's impacts remain "highly controversial," necessitating an EIS. *See*

*Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, No. 20-5197, slip op. at 21 (D.C. Cir. Jan. 26,

2021) (affirming need for an EIS and rejecting agency argument "that it had no need at all to

address" a controversy as an unacceptable "unadorned plea for deference").[17]

## IV.   USFS AND FWS VIOLATED THE ESA'S REQUIREMENTS FOR FORMAL CONSULTATION REGARDING IMPACTS TO THE INDIANA BAT

As explained, Br. 35–42, USFS and FWS violated the ESA in several important ways when

engaging in formal consultation over the Houston South Project: (1) by failing to consider the best

available scientific information during formal consultation; (2) by failing to consider the current

status of the species; and (3) by failing to consider the appropriate environmental baseline.

Defendants' responses misconstrue the ESA, misunderstand Plaintiffs' arguments, and

misstate the record. For example, apparently failing to recognize that Plaintiffs advanced *two*

arguments regarding the agencies' failure to consider *both* the "current status" of the species *and* the

"environmental baseline," Br. 40–42, Defendants wholly fail to address the "environmental

baseline" issue. As described above, Defendants concede this issue and summary judgment is

appropriate for Plaintiffs. As to the remaining arguments, Defendants lack any persuasive response.

### A.   USFS and FWS Failed to Use the Best Available Science

Plaintiffs explained that although the ESA mandates that agencies "shall use the best

scientific . . . data available," 16 U.S.C. § 1536(a)(2), when engaging in formal consultation over the

Houston South Project, neither USFS nor FWS considered or applied *any* of the ample scientific

---

[17] Defendants falsely suggest that Plaintiffs "argue that an EIS is required because they objected to
the Project, thus creating a 'dispute.'" Govt. Br 17–18. Plaintiffs did not make this argument, instead
identifying a "substantial dispute concerning the size, nature, or effect of the proposed action,"
based on "legitimate scientific debate" about the Project's impacts in light of WNS. Br.34.

literature available regarding WNS—which is the greatest threat to the Indiana bat's existence. Br. 35–40. Indeed, neither USFS's Biological Evaluation, which it sent to FWS to begin formal consultation, nor FWS's response, which it claimed "precludes the need for further informal and formal consultation" on the Project, FWS2535, even *mentioned* that the species is afflicted by WNS.

Defendants' response significantly misconstrues the ESA's mandate that agencies "shall use the best scientific . . . data available" during formal consultation. 16 U.S.C. § 1536(a)(2). Defendants suggest that FWS made a "reasonable scientific choice" not to discuss the available information about WNS's impacts on the endangered Indiana bat.[18] Even setting aside the fact that this is an impermissible *post hoc* rationalization that was never advanced by the agencies themselves, the ESA does not permit agencies to decide to ignore scientific information about a threat to a listed species. Under the ESA's mandate that the agencies "shall use" the best available scientific information, FWS "is not free to disregard [] available scientific information," but instead "must seek out and consider all existing scientific data relevant to the decision it is tasked with making." *Defenders of Wildlife v. U.S. Dep't of Interior*, 931 F.3d 339, 346 (4th Cir. 2019); *see also Ctr. for Biological Diversity v. Zinke*, 900 F.3d 1053, 1068 (9th Cir. 2018) (FWS "cannot ignore available biological data").

Moreover, as explained above, Defendants' purported rationale for ignoring WNS's threat to the Indiana bat—that "there are no Indiana bat hibernacula within the Project boundaries or near the Project"—is not "reasonable," as Defendants suggest, Govt. Br. 34, because WNS harms bats during the active season rather than merely during hibernation. For example, due to WNS, "[f]emales that migrate successfully to their summer habitat," such as the Houston South Project

---

[18] In advancing this argument, Defendants note that "the EA does not specifically mention WNS in its section on the Indiana bat." Govt. Br. at 34. This is true and, as discussed above, reflects a fundamental shortcoming in the agency's NEPA analysis (i.e. a failure to take a hard look at the Project's environmental impacts on a vulnerable species). However, under the ESA, the EA prepared by USFS is not the critical legal document; instead, the formal consultation documents are chiefly at issue—*i.e.* USFS's Biological Evaluation and FWS's Biological Opinion issued in response. However, those documents *also* fail to discuss WNS in their discussion of the Indiana bat. *See* Br. 37.

area, "must partition energy resources between foraging, keeping warm, reproducing, and recovering from the disease." FWS1475; *see also id.* (noting the disease causes wing damage and fat depletion that make migration and foraging more difficult). Moreover, WNS is *the greatest threat* to the Indiana bat. *See* FWS1474 ("WNS is capable of bringing about severe numerical reduction in population size and local and regional extirpation of the Indiana bat."); FWS1466 ("[T]he Indiana bat continues to warrant listing as endangered based on this factor [WNS] alone."). Hence, even if the ESA allowed agencies to intentionally disregard scientific information about threats to endangered species— which it emphatically does not—the decision to disregard information about WNS would still be arbitrary and capricious under these circumstances.

Defendants also seriously misrepresent the record by suggesting that the agencies did consider scientific information on WNS. *See* Govt. Br. 24, 25, 33 (citing FS10046, FS10013, FWS1513, and FWS889–939). Defendants' citations do not support their assertions. Notably, FWS889–939 is merely a list of scientific resources, many of which *do not appear in the record*, and were not discussed or cited during formal consultation over this Project. Far from indicating that the agencies *used* the best available scientific information, this citation merely demonstrates that scientific information was *available but unused*. Defendants also cite FS10046, a document entitled "Beneficial Forest Management Practices for WNS-affected Bats." Although this document does appear in the record, the agencies never discussed it nor even cited it during formal consultation over this Project. *See* FWS2529–2574 (Project consultation); FWS2568–71 ("Literature Cited" section of USFS Biological Evaluation); FWS2529 (FWS stating it "conducted our project-specific review and consultation for this project using information" that does not include this document); FS4223–4230 ("References" section of USFS EA). Moreover, this document supports Plaintiffs contention that the agencies should have considered some restriction on prescribed burning, as described above, because it indicates that "*[i]f prescribed fire must be conducted during the maternity season (when non-volant*

young may be present in trees and snags) to meet management needs . . . then *use only low-intensity burns during moderate winds (>5 mph)* to reduce potential heat injury to roosting bats." FS10063–64 (emphases added). Neither USFS nor FWS considered this guidance, failing to contemplate a seasonal restriction on prescribed burning—despite previously imposing this same restriction on a similar project to protect this species, FS9941—and failing to contemplate any restriction on burns based on wind speeds. The failure to consider this information (or even explain why its guidance was not followed) confirms that, although this document appears in the record, its scientific information was never actually *used* during Project consultation. This is a straightforward violation of the ESA's mandate that agencies "shall *use* the best scientific . . . data available" in formal consultation. 16 U.S.C. § 1536(a)(2) (emphasis added); *see also Ctr. for Biological Diversity*, 900 F.3d at 1068 (agencies "cannot ignore available biological data").[19]

Defendants also fundamentally misconstrue the ESA's mandate to use the best available science during formal consultation by suggesting it was sufficient for the agencies to merely employ individuals with general knowledge about WNS. *See* Govt. Br. 33 ("the agencies were well aware of WNS"); *id.* at 35 (stressing that FWS biologist Andrew King "is an expert on the Indiana bat and was most certainly aware of" scientific literature regarding threats to the bat). However, agency officials—no matter how knowledgeable—fail to satisfy the ESA's mandate to "use the best scientific . . . data available," 16 U.S.C. § 1536(a)(2), unless they actually *use*—*i.e.*, "employ[] or apply[]"—the best scientific information available. *Use*, Webster's New Collegiate Dictionary (7th ed. 1967). Essentially, Defendants argue that the agencies used the best available science because their

---

[19] Defendants' citation of FS10013 is misleading. That document is USFS's 2012 "Review of New Information: White Nose Syndrome and Forest Bat Populations." Plaintiffs explained in detail why that document does not cure the agencies' failure to consider the best available science *during Project consultation*, including because that it is badly outdated and was never discussed or cited. Br. 39–40. Defendants' response does not refute any of Plaintiffs' explanations, and the reliance on this document without responding to Plaintiffs' arguments about the document is without merit.

employees should have been aware of that science, even though they did not discuss or even cite such information in the actual consultation documents. However, "when reviewing a biological opinion, [courts] rely only on what the agency *actually said* in the BiOp to determine whether the agency considered the appropriate factors." *Pac. Coast Fed'n of Fishermen's Ass'ns v. U.S. Bureau of Reclamation*, 426 F.3d 1082, 1091 (9th Cir. 2005); *see also id.* ("To permit an agency to 'implicitly' conclude that a species would not be jeopardized by a proposed activity, and not require the agency to articulate a basis for its conclusion, would reject the bedrock concept of record review."). Because USFS and FWS failed to consider or apply the best available scientific information regarding the Indiana bat—and particularly concerning the threat from WNS—the agencies violated the ESA.

Defendants fare no better in their discussion of FWS's 2019 5-year Review of the Indiana bat. To begin with, Defendants significantly misconstrue Plaintiffs' argument by suggesting that it "hangs on the fact that [FWS] did not specifically cite" this document "in its consultation letter." Govt. Br. 34. To the contrary, Plaintiffs do not argue merely that FWS failed to cite this document or the scientific literature cited therein (although this is true and plainly violates the ESA). Instead, Plaintiffs also explained that this document—which *does* consider available scientific information—comes to fundamentally different conclusions from the consultation over this Project. Br. 36–37. Thus, FWS's 2019 Review described the need for a "holistic approach" to threats to the Indiana bat, FWS1473, and stressed that agencies should devote "renewed attention to other threats," such as threats from forestry activities, which could "enable immediate intervention on other threats more amenable to management," FWS1485–86. Yet when FWS consulted over the Houston South Project, it devoted no "renewed attention" to other threats, such as the threat to females and baby bats from prescribed fire, despite the fact that this threat is amenable to management through a seasonal restriction on burning that would prevent harm to the species. *See* FS9941 (imposing a seasonal restriction on prescribed burning in a prior project to protect this species). Hence, the

39

agencies' failure to consider information in FWS's 5-year Review is not, as Defendants suggest, merely a failure to cite that document; to the contrary, it reflects a more fundamental failure to devote the "renewed attention" to other threats to the species that FWS itself found was necessary.

Moreover, Defendants' ostensible reasons for failing to cite the 2019 5-year review lack merit. For example, Defendants assert that USFS had no duty to provide this document to FWS because it was not complete when USFS initiated formal consultation. Govt. Br. 34. However, Plaintiffs did not fault only USFS for failing to *provide* this document; Plaintiffs also explained that FWS violated the ESA by failing to *use* it. Govt. Br. 37.[20] Defendants' assertion that the agencies implicitly considered the information in the 2019 Review because it was written by the same biologist who conducted formal consultation over this Project is without merit, both because an employee's general knowledge is not a substitute for the actual *use* of that knowledge during formal consultation, and because the two documents point in fundamentally different directions, with the 2019 Review calling for "renewed attention" to more manageable threats to the species, FWS1485, which the consultation over this Project failed to provide.[21]

**B.** **FWS Failed to Evaluate the Current Status of the Indiana Bat**

As Plaintiffs explained, Br. 40–42, FWS also violated the ESA by failing to consider the "current status" of the Indiana bat during formal consultation over the Houston South Project.

---

[20] As to USFS, Defendants' suggestion that the agency could not cite the 2019 5-year review because it was not yet published is not borne out by the record. USFS cited numerous unpublished resources in soliciting formal consultation—including from Mr. King. *See* FWS2569 (FS letter initiating consultation citing "[p]ersonal communication" and email from Mr. King in 2014, as well as a different "[u]npublished survey report" based on "personal communication"). Moreover, even if the 2019 review were truly unavailable, USFS could have discussed and provided the prior review of this species from 2009, which included some discussion of WNS, but USFS also failed to provide or discuss this document. *See* FWS2568–71 ("Literature cited" section not citing 2009 review).

[21] Defendants' citation to FWS1208 to claim that "Mr. King relied upon other references discussing WNS in his evaluation," Govt. Br. 35, is misleading because Mr. King did not discuss that document, or many other available scientific resources, during formal consultation over the Project.

FWS's "responsibilities" during formal consultation require it to "[e]valuate the current status . . . of the listed species," 50 C.F.R. § 402.14(g)(2), yet FWS failed to acknowledge that the species' population has been rapidly declining, or that Indiana has lost more individuals than any other state.

Defendants have no persuasive response. Most critically, Defendants do not identify any point during the formal consultation process where FWS recognized the rapid declines in the Indiana bat's population range-wide or in Indiana. Although Defendants' response brief cites FWS's "2019 Indiana bat (*Myotis sodalis*) Population Status Update," Govt. Br. 35 (citing FWS1200), the agencies' actual Project consultation documents ignore that document altogether. *See* FWS2529–71. Moreover, the Project consultation documents are also bereft of the *information* in that document— namely, the recognition that the Indiana bat populations have substantially declined and that Indiana has lost more individuals than any other state. *See* FWS2533–34 (FWS discussion of the Indiana bat failing to discuss population trends); FWS2556–60 (same deficiency in USFS Biological Evaluation). Thus, the only import of that document is that the agencies had access to information about the rapidly declining "current status" of the species, especially in Indiana, which they failed to consider, thus violating the ESA's requirements during formal consultation.

Defendants also argue that because there are likely fewer maternity colonies in the Hoosier National Forest than in 2006, the odds of the Project taking a bat are "lower than when originally analyzed in 2006." Govt. Br. 35. For support, the government cites FWS271, which is a letter from FWS in response to Plaintiffs' notice letter advising the agencies of their deficient ESA consultation. Defendants' argument misses the point. The cited letter from FWS, which purports to belatedly consider the species' population trends, is not a surrogate for compliance with the ESA's requirement to consider the "current status" of the species during formal consultation.

Moreover, simply stating that the Project is less likely to take a bat is not a substitute for rigorous analysis of the *impact to the species*. Because the bat's population has declined, any take from

the Project is *more likely to harm the species' survival and recovery prospects*. Indeed, the cited letter's reasoning is inconsistent with FWS's own findings based on the best available science. For example, that letter suggests that "[t]he Indiana bat population numbers in Indiana have remained relatively stable over the past four survey years (185,720 in 2015; 180,611 in 2017; and 184,848 in 2019)," ostensibly "demonstrating the species' resiliency and ability to tolerate, adapt, and persist despite the nearly decade-long threat posed by WNS and other potential threats within the state." FWS271. However, that letter misleadingly omits key facts, including that the species' population has declined by over 40,000 individuals since 2011, *see* FWS1200 (noting a 2011 population in Indiana of 225,477, but a population in 2019 of only 184,848), and that Indiana has lost more individuals than any other state, FWS1199. Moreover, the letter also ignores the findings in FWS's own 2019 Review that the "relatively high annual survival in infected Indiana bats may veil a persistent extinction risk from disease," and that "the cumulative long-term risk of WNS to Indiana bats may be more severe than current population trends suggest." FWS1474. FWS's letter refusing to correct its legal violations thus does not cure its failure to consider the current status of the species. *See, e.g.*, *Ctr. for Biological Diversity*, 900 F.3d at 1068 ("FWS acted in an arbitrary and capricious manner by ignoring available biological data showing that the arctic grayling population . . . was declining.").

## C.    USFS and FWS Must Reinitiate Consultation

Plaintiffs also established that USFS and FWS must reinitiate formal consultation over the Houston South Project: (1) to remedy their ESA violations; (2) because the amount of take allowed by the Incidental Take Statement ("ITS") on which the agencies rely has been exceeded; and (3) because the Project may affect the Indiana bat in a manner not previously considered. Br. 42–45.

Defendants' response misconstrues Plaintiffs' position, distorts the record, and ignores critical issues. For example, Defendants mischaracterize Plaintiffs as arguing that "the 2006 Biological Opinion is 'invalid.'" Govt. Br. 36. This is not Plaintiffs' argument; the validity of the

2006 Biological Opinion ("BiOp") is not at issue in this case. Instead, Plaintiffs argue that FWS's BiOp *for the Houston South Project* is invalid because, as discussed above, FWS failed to comply with the ESA's requirements for formal consultation, including the mandates to consider the best available science, the current status of the species, and the environmental baseline. Reinitiation of consultation is the appropriate remedy for the violations of the ESA that occurred during formal consultation over *this Project*. *See, e.g., Ctr. for Biological Diversity v. U.S. Bureau of Land Mgmt.*, 698 F.3d 1101, 1128 (9th Cir. 2012) (requiring reinitiation of consultation to cure legal deficiencies).[22]

As to the 2006 BiOp, Plaintiffs also argue that reinitiation of consultation is necessary because "the amount or extent of taking specified in the incidental take statement is exceeded." Br. 42–43 (quoting 50 C.F.R. § 402.16(a)). Again, Plaintiffs have not argued that the 2006 ITS was invalid when issued; instead, Plaintiffs explained that the amount or extent of taking authorized by that 2006 ITS—which FWS and USFS relied on to authorize the Houston South Project—has been exceeded because that 2006 ITS only contemplated and authorized takings that would occur over a ten-year period, *i.e.* until 2016. Br. 43. In response, Defendants recognize that the 2006 ITS authorized take in the form of habitat alteration by multiplying an annual projected level of activity by a ten-year projected activity period, but maintain that the ITS still authorizes the full amount of take through habitat damage despite that ten-year period having elapsed. Govt. Br. 38–39.

Defendants' argument lacks merit for several reasons. First, it ignores numerous instances in which the 2006 BiOp's plain text stated its ten-year limitation. *See* FS9952 (2006 BiOp stating that it analyzed "management activities that may cause Indiana bat habitat modification and/or species

---

[22] Defendants also misconstrue the 2006 BiOp's "appended programmatic consultation" approach by suggesting that site-specific actions like such as this Project must merely "be reviewed to determine if they are consistent with the Biological Opinion and Incidental Take Statement." Govt. Br. 36. In fact, the 2006 BiOp plainly states that "[i]f it is determined that a project is likely to adversely affect listed species, the Service and Forest Service engage in formal consultation for the specific project. Project level formal consultation culminates with the Service providing a biological opinion that is appended to the Program-level biological opinion." FWS2649.

harm *and will occur over the next ten years*" (emphasis added)); *see also* FS9950 (2006 BiOp stating that "[t]he Forest Plan describes the landscape goals for the Forest *for the next 10 years*" (emphasis added)). Likewise, Defendants' argument ignores the fact that when tracking take under the 2006 ITS, *all* of USFS and FWS's "Take-Tracking Spreadsheets" consistently state that they track the "Exempted Level of Take *Over 10 years*." *E.g.* 2536–37 (emphasis added). Defendants' argument also ignores that USFS itself confirmed that the agencies would "reach the end of the 10-year planning period" in 2016. FS10040. Now that Defendants wish to authorize take for *another 20 years*, they apparently find the 2006 BiOp and ITS's "10-year planning period" inconvenient. However, as Plaintiffs explained, Br. 43, the authorization of harms from this Project that will last for decades is not contemplated by an ITS that analyzed activities that would occur over ten years, *i.e.* until 2016. *See Oceana, Inc. v. Pritzker*, 125 F. Supp. 3d 232, 247–250 (D.D.C. 2015) ("An obvious consequence of the agency's decision to employ a ten-year time frame [] is that upon the expiration of ten years from the date of issuance of this BiOp [], the BiOp's analysis will have reached the extent of its applicability," and new analyses will be required to authorize continued take).[23]

Defendants simply ignore Plaintiffs' third argument—namely, that reinitiation of consultation is necessary because the Houston South Project will harm the Indiana bat in a manner or to an extent not previously considered. Br 43–44. As Plaintiffs explained, the 2006 BiOp and ITS never analyzed how forestry activities such as the Houston South Project would harm the Indiana bat *in combination with WNS* because the disease had not yet emerged as a threat to the species at that time. Br. 43–44. Moreover, FWS's own 2019 Review confirms that WNS exacerbates other threats to the species, such as threats from the Houston South Project. *Id.* For example, sick bats have a

---

[23] Defendants' argument that the Forest Plan lasts until revised, Govt. Br. 37–38, is misleading because the validity of the Forest Plan is not at issue. The authorities Defendants cite apply *solely* to the Forest Plan, not to FWS's BiOp or ITS regarding that Plan, which plainly described their analysis and authorization of impacts under the ESA that "will occur over the next ten years." FS9952.

more difficult time foraging, and this is especially problematic for females, which face an exacting energy budget *even when not suffering from disease*. FWS1475. Because the 2006 BiOp and ITS only contemplated how forestry activities would impact *non-diseased bats*, while the Houston South Project will have impacts to bats *already suffering from a deadly disease*, the Project may harm the species in a manner or to a degree not previously considered. *Id.* Because Defendants incorrectly claim that WNS harms bats only during hibernation (as debunked above), they entirely ignore this issue. Defendants thus effectively concede that reinitiation is necessary to consider this issue.

### D.   USFS Violated the ESA's Requirements for Formal Consultation

Finally, Plaintiffs explained that USFS violated the ESA by relying on a Biological Opinion for the Houston South Project that fails to comport with the ESA's mandates. Br. 45. Although Defendants generally defend the ESA consultation process for the Project, they do not respond to this argument specifically. As Plaintiffs explained, if the Court identifies a violation of the ESA during formal consultation over this Project, it must also find that USFS independently violated the ESA as well by relying on a legally invalid BiOp. *See Ctr. for Biological Diversity*, 698 F.3d at 1127–28.

### CONCLUSION[24]

For all the reasons explained here and in Plaintiffs' opening brief, this Court should enter summary judgment for Plaintiffs, vacate USFS and FWS's authorizations for the Houston South Project, and remand to the agencies for decision-making consistent with NEPA and the ESA.

Respectfully submitted,

/s/ William N. Lawton

William N. Lawton

---

[24] Defendants do not dispute that Plaintiffs have standing. *See* Br. 45 n.14; *see also* ECF Nos. 34-1 to 34-4. Although Defendants suggest Plaintiffs' declarations are merely "extra-record opinions," Govt. Br. 15 n.9, these declarations appropriately establish the basis for Plaintiffs' standing. *See, e.g., Stauber v. Shalala*, 895 F. Supp. 1178, 1188 (W.D. Wis. 1995) ("[I]n analyzing standing, [courts are] able to consider evidence that is outside the administrative record . . . .").

DC Bar No. 1046605
admitted *pro hac vice*

William S. Eubanks
DC Bar No. 987036
admitted *pro hac vice*

Eubanks & Associates, PLLC
1331 H Street N.W., Suite 902
Washington, D.C. 20005
(202) 556-1243
nick@eubankslegal.com
bill@eubankslegal.com

Counsel for Plaintiffs

## CERTIFICATE OF SERVICE

I hereby certify that on January 26, 2021, a copy of the foregoing was filed electronically through the Court's CM-ECF system, which will be automatically served electronically on all counsel of record.

/s/ William N. Lawton
William N. Lawton
Counsel for Plaintiffs